HATTIE OFFUTT *v.* E. GREGG SHEEHAN.

[No. 1-175A3. Filed March 17, 1976.]

*James M. Redwine, Trockman, Flynn, Swain & Tyler,* of Evansville. *Arthur Griffith,* of Evansville, for appellant.

*Robert H. Hahn, George A. Porch, Bamberger, Foreman, Oswald and Hahn,* of counsel, of Evansvlle, for appellee.

LOWDERMILK, J.—In July, 1972, plaintiff-appellant (Offutt) filed her complaint, alleging that the defendant-appellee (Sheehan) had, without her prior knowledge or consent, performed a complete hysterectomy upon her. After trial in 1974, the jury found against Offutt, and the trial court entered judgment that Offutt take nothing by her complaint. Offutt now appeals the above verdict and judgment.

## FACTS

In March of 1971, Offutt was advised by Dr. William Vincent that she was three (3) to four (4) months pregnant with her third child. At that time Dr. Vincent referred her to Dr. Sheehan for further examination and pre-natal care.

During one of Offutt's visits with Sheehan, Offutt stated that she could not tolerate oral or permanent internal contraceptive devices because of other health problems, but that she did not want to have any more children. Offutt then inquired whether Sheehan would perform either a tubal ligation or tubal resection.

Given Offutt's age (26), and other factors, Sheehan asked that Offutt put her request in writing. Sheehan, approximately one (1) month before delivery of the child, received a letter from Offutt which requested that her "tubes be tied," because she could not use conventional contraceptive methods. Following receipt of this letter, Sheehan again talked with Offutt and advised her that she would be unable to have children following such an operation.

On August 13, 1971, Sheehan was contacted at his home by telephone and informed that Offutt was in the hospital in an advanced stage of labor. Sheehan prescribed several pain-relieving and/or muscle relaxing drugs, and later proceeded to the hospital. After his arrival, Sheehan discovered that the baby was in a breech position and that a cesarean section would probably be necessary. This determination was concurred in by another attending physician.

While Offutt was still in the labor room, she was presented with authorization forms which requested and permitted a tubal ligation and a cesarean section, as well as a tubal resection. The consent forms also contained the following language:

"If any unforeseen condition arises in the course of the operation, calling in his judgment, for procedures in addition to or different from those now contemplated, I further request and authorize him [Sheehan] to do whatever he deems advisable."

Sheehan conversed with Offutt when these forms were presented and Offutt appeared to comprehend what was said. Offutt's signature appears on all of the forms, and each is further signed by two witnesses.

Offutt was subsequently prepared for the operation and given a general anesthetic. During the course of the cesarean section, it became necessary to make a very large incision in the uterus to remove the baby. After the baby was successfully removed, Sheehan and another doctor considered the size of the incision, in light of Offutt's request for sterilization and other factors as related by Sheehan's testimony:

". . . So we were faced with leaving a uterus that was quite scarred. We knew her past history of having had an atypical cancer smear in the past, although it was normal during this pregnancy, and having some cervicitis from our examination. We know that girls who start having relations at a young age and with different men often tend to get cancer of the cervix. We knew she had a tendency towards diabetes; we knew she had high blood pressure; and we

knew she was obese; women who have this tend to get cancer of the uterus. So, here we have a patient who has a problem, and really just arose, that we are going to leave in this large, scarred uterus, and the only safe thing for her to have done was to have that uterus taken out at that time, it was the only medically feasible thing to be done at that time was to take her uterus out. It possibly could have been sewed up and saved, this is possible, but it would have been a much greater risk than what we did, much greater.

Q. Did you consult with Dr. Stoller at that point?

A. Yes, I did.

Q. And whether he concurred in your decision?

A. Yes, he did."

Following a brief consultation in the operating room, Sheehan removed Offutt's uterus.

## ISSUES

Offutt presents the following issues for our consideration:

1. Whether it was error for the trial court to deny a request for new trial based on newly discovered evidence.

2. Whether the trial court erred in making the following evidentiary rulings:

    (A) Permitting the testimony of a nurse regarding the effects of certain drugs and hospital procedures for obtaining signatures on consent forms.

    (B) Sustaining Sheehan's objection to Offutt's question about what would happen if no consent forms were used or signed.

    (C) Refusal to permit questions regarding the division of monies received by Sheehan's partner.

    (D) Admission into evidence of certain medical records.

3. Whether the verdict was contrary to law.

4. Whether the trial court erred in refusing to rule on Offutt's petition to proceed *in forma pauperis*.

## I.

It is Offutt's first argument that evidence which was discovered after trial was so material that it was error for the trial court to deny a new trial based on such evidence. Offutt asserts that she was unable, through due diligence, to discover the new evidence before trial, and that said evidence was promptly presented to the court upon its discovery.

The new evidence urged by Offutt is the testimony, by affidavit, of Nancy Lee Tedford (Tedford), who was a nurse's aide at the hospital where and when Offutt's operation took place. Although Tedford was not in the operating room, we note the following excerpts of her affidavit regarding a conversation between Tedford, Sheehan, and Lou Wilson, a nurse:

"1. She is not related by blood or marriage to Hattie Offutt, any member of Hattie Offutt's family, or to James M. Redwine or Arthur Griffith or any member of their families;

\* \* \*

4. She reported to work August 12, 1971, and went to B-2 where she worked for awhile until she received a call to go to O.B. on the third floor;

7. The first thing she noted was the patient's name, Hattie Offutt, which was the name of a girl she had gone to school with years before. She noted that the patient had never been married, had had two (2) children, and was twenty-six (26) years old;

\* \* \*

9. She then went back to the utility room by the kitchen, and E. Gregg Sheehan and Mrs. Wilson were there. At this time, the other nurse's aide was in the delivery room getting it ready. At this time Mrs. Wilson said, 'We are going to take her to surgery.' Your affiant asked, 'What for?' Mrs. Wilson said, 'Gregg wants to take her down to surgery for a hysterectomy and to deliver that baby.' Your affiant said, 'Isn't she too young for a hysterectomy?' and Sheehan said, 'Lady, that's your tax money down there, you already paid for two (2) of them, and that's the third one and there will be no more.' Your affiant said, 'I don't know about that being my tax money.' At which time Mrs. Wilson said, 'Oh, Tedford, you're so naive.'

\* \* \*

11. . . . The next day, July 3, 1974, at approximately 11:00 o'clock p.m., Kathleen told your affiant that Hattie had lost the case at which time your affiant authorized Kathleen to tell Hattie her name and what your affiant knew about the matter;

12. On July 4, 1974, Hattie Offutt called your affiant at home at about 7:00 o'clock p.m. and asked your affiant if she would testify and if she would talk to her attorney, James Redwine;

13. At approximately 10:00 o'clock p.m. July 4, 1974, Attorney James Redwine called your affiant and discussed the matter and set an appointment for 8:00 o'clock a.m. July 5, 1974. This was the first contact that your affiant has ever had with Attorney James Redwine;"

Offutt contends that inasmuch as her theory of recovery was intentional tort, the above evidence clearly requires a new trial.

It has been often stated by the courts of this State that

"An application for a new trial, made on the ground of newly discovered evidence, must be supported by affidavit and such affidavit or affidavits must contain a statement of the facts showing (1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced upon a retrial of the case; and (9) that it will probably produce a different result. *Cansler* v. *State* (1972), [258] Ind. [450], 281 N.E.2d 881; *Tugate* v. *State* (1958), 238 Ind. 48, 147 N.E.2d 232. In deciding whether a piece of newly discovered evidence would produce a different result the presiding judge may properly consider the weight which a reasonable trier of fact would give it and, while so doing, may also evaluate its probable impact on a new trial in light of all the facts and circumstances shown at the original trial of the case."

*Emerson* v. *State* (1972), 259 Ind. 399, 287 N.E.2d 867, 871, 872.

Other cases establish that there is a strong presumption that the evidence could have been discovered prior to trial,

*Trout* v. *Summit Lawn Cemetery Association, Inc.* (1974), 160 Ind. App. 552, 312 N.E.2d 498, 500, and that every such motion should be received with caution and carefully scrutinized. *Kelly* v. *Bunch* (1972), 153 Ind. App. 407, 287 N.E.2d 586, 588; *Shaw* v. *Shaw* (1973), 159 Ind. App. 33, 304 N.E.2d 536, 541; *Anderson* v. *State* (1928), 200 Ind. 143, 148, 161 N.E. 625.

With reference to the quotation above from *Emerson* we find that Tedford's evidence would probably satisfy requirements one (1) through five (5), and eight (8). We conclude however, that the trial court could have properly denied Offutt's motion by relying on items six (6), seven (7) or nine (9) above. The court had before it not only Tedford's affidavit, but opposing affidavits from Sheehan, Wilson and others. In addition, the court was aware of what discovery had taken place, and of course had heard the testimony at trial. Thus, while we do not speculate as to the trial court's precise reasoning in denying the motion for new trial, we hold that such action is not reversible error.

## II.

*A.* Offutt's first argument regarding various rulings by the court is that it was error for the court to allow nurse Wilson to testify as to the effect of certain drugs commonly administered in the labor room at the hospital in question, and to allow Wilson's testimony concerning procedures for obtaining signatures on consent forms.

While Offutt concedes that allowing a witness to testify as an expert is a matter of discretion for the trial court, *See, McCraney* v. *Kuechenberg* (1969), 144 Ind. App. 629, 248 N.E.2d 171, she contends that because Wilson could not specifically recall Offutt's case, and because Wilson stated she was not qualified to comment on the composition of certain drugs, any testimony by Wilson was improper.

The record in this case reveals that Wilson had been a nurse for approximately twenty (20) years when Offutt entered the hospital, and that for at least eight years prior to the above-related incident she had been working in obstetrics at the hospital here involved. Further, Wilson stated that she was familiar with hospital procedures, and that she had observed numerous patients who had been administered the same drugs in the same amounts as Offutt.

After considering the above facts in relation to the nature of the questions asked and answers given, we have concluded that it was not error to allow Wilson to testify as an expert. One may be an expert by training or experience, and if properly qualified may testify as to the nature and conduct of a business. *See, Automobile Underwriters, Inc.* v. *Smith* (1960), 131 Ind. App. 454, 166 N.E.2d 341, transfer den. 241 Ind. 302, 171 N.E.2d 823; *Tomchany* v. *Tomchany* (1962), 134 Ind. App. 27, 185 N.E.2d 301; *Smith* v. *Uniroyal, Inc.*, 420 F.2d 438 (7th Cir. 1970). Although Wilson's testimony may not have related only to Offutt, we believe the judge properly allowed her to testify as to her personal observations and experiences which related to the issues then before the jury. Of course the jury could assign whatever weight to the testimony it thought warranted. *Dudley Sports Co.* v. *Schmitt* (1972), 151 Ind. App. 217, 279 N.E.2d 266; *Klinger* v. *Caylor* (1971), 148 Ind. App. 508, 267 N.E.2d 848. We find no abuse of discretion in permitting Wilson to take the stand as an expert witness. *McCraney* v. *Kuechenberg, supra; Kampo Transit, Inc.* v. *Powers* (1965), 138 Ind. App. 141, 211 N.E.2d 781.

Offutt also raises an additional argument concerning testimony by Wilson. This additional argument relates to certain written documents made by Wilson at the time of the operation and allegedly used to support Wilson's testimony at trial. Offutt contends that the use of the documents was improper inasmuch as Wilson had no independent recollection of the contents of the documents when presented

at trial. This argument was not included nor argued in appellant's brief, and was presented to us for the first time in oral argument. Having failed to present the alleged error in her brief Offutt has waived this issue. Ind. Rules of Procedure, Appellate Rule 8.3 (A) (7).

*B.* Offutt next contends that the trial court improperly sustained Sheehan's objection to a question which asked Sheehan's opinion as to what would have happened had Offutt not signed the consent forms. Offutt argues that such action by the court was "reversible error to [her] prejudice."

In considering this argument we note that Offutt cites no authority in support of her position, and this alone amounts to a waiver of this issue. Ind. Rules of Procedure, Appellate Rule 8.3 (A) (7) ; *Matthew* v. *State* (1972), 154 Ind. App. 182, 289 N.E.2d 336; *Williams* v. *State* (1973), 260 Ind. 237, 294 N.E.2d 793. Further, however, we find that Offutt's argument on this issue is in effect no more than an invitation to reconsider certain evidence given at trial; an invitation we must decline. Finally, we note that although Offutt alleges "prejudice," there is no articulation of exactly how the court's action prejudiced her cause at trial. Thus, for the above reasons, we find no reversible error in the trial court's ruling.

*C.* Offutt next attacks the propriety of the court's sustaining Sheehan's objection to a question regarding the division of money among Sheehan and his partners. Offutt contends that the court's ruling improperly restricted her cross-examination of Sheehan's partner in order to show bias, interest or prejudice. Offutt places much reliance on the following quotation from *Niemeyer* v. *McCarty* (1943), 221 Ind. 688, 700, 701, 51 N.E.2d 356 (partially overruled on other grounds in *Ashton* v. *Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210) :

"... In *Dotterer* v. *State, supra,* it is said (page 362 of 172 Ind., page 692 of 88 N.E., page 852 of 30 L.R.A. [N.S.]) : 'It is a well-recognized rule that any fact tending to impair the credibility of the witness, by showing his interest, bias, ignorance, motives, or that he is depraved

in character, may be shown on cross-examination, but the extent to which such cross-examination may be carried is within the sound discretion of the court. (Authorities.)' See, also, *Grose* v. *State* (1926), 197 Ind. 331, 149 N.E. 722. But the statement that 'the extent to which such cross-examination may be carried is within the sound discretion of the court,' must not be construed as authorizing the entire exclusion of such testimony in the trial court's discretion, and the cases referred to do not so hold. . . ."

Again, while Offutt apparently agrees that a trial court may, in its discretion, limit cross examination and thus implicitly recognizes that we may overturn the court's action only for a manifest abuse—she contends that the ruling by the trial court "completely" limited her attempt to show the bias and prejudice of Sheehan's partner. We do not agree.

Although Offutt was not able to put before the jury exactly how the money of the medical partnership was divided, other evidence established the nature of the partnership; the fact that the partners assisted and consulted each other; and that the testifying partner would not be unfavorably affected by a verdict adverse to Sheehan. Additionally, at the time Sheehan objected to Offutt's question, the following exchange occurred:

"MR. REDWINE: Your Honor, I'm asking the question for the purpose of showing intent, bias or prejudice on the part of this witness.

MR. HAHN: We'll stipulate that this witness is interested in this lawsuit. He participated in the outcome or in the surgery involved here.

MR. REDWINE: Will you stipulate that he's biased? Will you stipulate that he is biased?

MR. HAHN: I certainly will not.

MR. REDWINE: Then I think I have a right to ask the question."

*D.* Offutt's final argument with regard to the trial court's evidentiary rulings is that it was error to admit into evidence certain medical records which were kept at the medical partnership's office. Offutt asserts that all medical records

which were to be introduced at trial were stipulated to at the pre-trial conference, and that the records here attacked were not among those exhibited at the conference. Further, Offutt contends that no proper foundation was laid prior to the introduction of the records, and that the records do not fit within the business records exception to the hearsay rule.

We agree with Offutt that the pre-trial stipulation encompassed both "hospital" and "medical" records. However, even assuming that it was error to admit the records into evidence, Offutt does not inform us, nor do we find, how the records prejudiced the trial of this matter.

Further, a hospital record nearly identical to the one here disputed was introduced pursuant to the pre-trial stipulation. The only difference between the two records is that one contains notations concerning several additional pre-natal visits. In light of the above, we hold that the records introduced over Offut's objection were in large part merely cumulative, and any error was harmless. *McCray Memorial Hospital v. Hall* (1967), 141 Ind. App. 203, 226 N.E.2d 915; *Patrons of Noble County School Corp.* v. *School City of Kendallville* (1963), 244 Ind. 675, 194 N.E.2d 718; *Elgin, J. & E. Ry. Co.* v. *Collins* (1970), 147 Ind. App. 343, 260 N.E.2d 810; *Rocoff* v. *Lancella* (1969), 145 Ind. App. 440, 251 N.E.2d 582.

### III.

Offutt's third major argument is that the verdict was contrary to law.

Of course, Offutt is appealing a negative judgment, and she recognizes that we may not reverse unless, after considering only the evidence most favorable to Sheehan, we find that the evidence leads to but one conclusion and the jury reached an opposite conclusion. *Link* v. *Sun Oil Co.* (1974), 160 Ind. App. 310, 312 N.E.2d 126; *Carsten* v. *Eickhoff* (1975), 163 Ind. App. 294, 323 N.E.2d 664.

Without specifically reviewing the evidence at this point it can be stated that there is conflicting evidence concerning

each major issue at trial. Offutt claims she did not knowingly sign a consent form; Sheehan and others state otherwise. Offutt claims the removal of her uterus was unnecessary; Sheehan and his partner say it was.

We are not at liberty to reweigh the evidence in this case, and we do not believe the evidence most favorable to Sheehan leads to a single conclusion which is opposite the jury's verdict. The verdict is not contrary to law.

## IV.

The final question to be considered is whether this court should "guarantee Hattie Offutt her constitutional right to due process and equal protection" by allowing her to proceed *in forma pauperis*. Offutt makes this argument in light of the trial court's refusal to rule on her petition to appeal *in forma pauperis* on the ground that it lacked jurisdiction.

Reading Offutt's original petition and appellate brief together we find that her request is for the costs of appeal only, and *not* for the appointment or payment of an attorney.

Offutt supports her request by reference to the following constitutional and statutory provisions:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any **person** within its jurisdiction the equal protection of the laws." United States Constitution, Amend. XIV, § 1.

"All courts shall be open; and every man, for injury done to him in his person, property or reputation shall have remedy by due course of law. Justice shall be administered freely *and without purchase;* completely and without denial; speedily and without delay." (Offutt's Emphasis.) Indiana Constitution, Art. 1, § 12.

"Any person entitled to institute any civil action or proceeding in the Circuit, Superior or Probate Court may,

upon order of the court, commence any such action or proceeding without being required to make the payment provided for by section 1 (section 49-1305a) of this Act or pay other court costs, upon filing in any such court a statement under oath in writing, that because of his poverty he is unable to make such payments or to give security for the same and that he believes that he is entitled to the redress he seeks in such action or proceeding, and setting forth briefly the nature of his alleged action or proceeding." IC 1971, 33-1-9-2 (Burns Code Ed.)

"Any poor person not having sufficient means to prosecute or defend an action may apply to the court in which the action is intended to be brought or is pending for leave to prosecute or defend as a poor person. The court, if satisfied that such person has not sufficient means to prosecute or defend the action, shall admit the applicant to prosecute or defend as a poor person, and shall assign him an attorney to defend or prosecute the cause, and all other officers requisite for the prosecution or defense, who shall do their duty therein without taking any fee or reward therefor from such poor person." IC 1971, 34-1-1-3 (Burns Code Ed.)

It is Offutt's contention that a reading of the above demonstrates that the trial court committed both statuory and constitutional error in refusing to consider her petition.

Before considering the merits of Offutt's argument, we feel it is necessary to set forth two additional points. First, Offutt did not file a petition of indigency before or any time during trial. The petition in question was filed immediately before the verdict and judgment, and before there was a motion to correct errors or any acquisition of jurisdiction by this court. Further, Offutt sought no review of the trial court's action with regard to her petition prior to filing her entire appeal.

A problem somewhat similar to the one presently in issue was considered recently in *Moore* v. *Spann* (1973), 157 Ind. App. 33, 298 N.E.2d 490. In that case the appellants filed motions to proceed as paupers with the juvenile court. These motions were denied and the appellants filed motions to correct errors which were also denied. Finally the appellants

in *Moore* filed a motion with this court to proceed as paupers and for the waiver of costs. This motion was granted upon a *prima facie* showing of indigency, and documents were filed without charge.

We consider the procedure followed in *Moore* as one acceptable way to address this court for permission to proceed as a poor person. However, it is essential to note in the case at bar that the petition for waiver of appellate costs was filed in the trial court, not in this court. We are of the opinion that such a procedure may also be proper and that the trial judge should have ruled on Offutt's petition.

Any petition of indigency necessarily requires the consideration of certain facts; and this may in turn require a hearing, the giving of testimony and the presentation of exhibits. The trial courts of this State are designed and uniquely suited for such a fact-finding procedure. The function of this tribunal, on the other hand, is not the initial discovery of fact, but the review of prior proceedings.

While trial courts may be understandably reluctant to order the waiver of appellate fees, the crucial act of the trial courts is their finding on the petition. If the petitioner is found to be indigent, then this court would entertain an order of the trial court setting forth the petition and the findings thereon. This court could then direct the clerk to waive docket and filing fees.

In those cases where the trial court found the petitioner not to be indigent, the petitioner could seek a review of that finding in this court, subject to usual appellate standards, by filing a petition for review of the trial court's denial of his petition to proceed as a poor person.

As our discussion above may indicate, we believe that the petition itself or the petition seeking review of the denial of such a petition should be filed in this court before any other pleadings. Of course, in cases such as the one at bar, any delay in considering either type of

petition could, in light of established deadlines for filing, jeopardize the ultimate right to present issues to this court. Faced with such a possibility, this court should give prompt attention to such petitions. In cases where time is severely limited by a late filing of such a petition it may be acceptable for the petitioner to include a prayer for extension of time in which to file a brief.

Turning to the instant case, we must conclude that Offutt has in effect waived the issue of her indigency by filing her full appeal, and presenting said issue as part of her brief. Obviously, Offutt has not suffered a denial of justice. She has been ably assisted by counsel, both at trial and in this appeal. At this point, the most that could be done would be to issue an order to reimburse Offutt for her filing fees. However Offutt cites no authority which would permit such action.

While our insistance that an indigency petition must precede other appellate pleadings may seem harsh, we deem it necessary. For example, it is common knowledge that numerous cases are taken by attorneys on a contingent fee basis because the client does not have funds adequate to pay for all of the necessary pre-trial and trial expenses. Yet, we do not believe that all such clients could be classified as "poor persons." Thus, by requiring the petition of either type to be filed first, this court can retain control over the waiver of fees, and grant such waiver only when appropriate.

Therefore, while we find it was error for the trial court to refuse to rule on Offutt's petition, we conclude that, given the particular facts of this case, there is no reversible error.

Judgment affirmed.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 344 N.E.2d 92.