IN RE THE WARDSHIP OF MILTON LOUIS BENDER,
RANDAL LEE BENDER, MARGARET E. MCAFEE,
CHARLES P. MCAFEE; NELMA GARD *v.*
ALLEN COUNTY DEPARTMENT OF PUBLIC WELFARE.

[No. 3-1274A212. Filed August 17, 1976. Rehearing denied
February 1, 1977.]

*Hugo E. Martz,* of Valparaiso, *William L. Briggs,* of Fort Wayne, for appellant.

*Philip H. Larmore, Adair, Perry, Beers, McAlister & Mallers,* of Fort Wayne, for appellee.

STATON, P.J.—The Allen County Department of Public Welfare petitioned to have the Gard children "found to be dependent and neglected children and be made wards of the County Department of Public Welfare for all purposes including adoption." The Allen Superior

Court, Juvenile Division found the Gard children to be dependent and neglected and terminated Gard's parental rights to her four children. Gard appeals this termination of her parental rights which raises these issues:

Issue One: Did the trial court err in admitting evidence obtained in violation of Gard's Fourth Amendment rights?

Issue Two. Was Gard denied due process for lack of notice that the proceeding was one to terminate parental rights?

Issue Three: Is there sufficient evidence to support the trial court's judgment terminating Gard's parental rights?[1]

We affirm.

I.

Illegal Search

Agents of the Welfare Department visited Gard's residence on four separate occasions and at the termination proceeding, these agents testified as to existing conditions in the Gard residence. On two of these visits, Welfare De-

---

1. On May 19, 1972, the Allen Superior Court, Juvenile Division ordered that Gard's four children be made temporary wards of the Allen County Department of Public Welfare. On appeal, Gard also challenges the validity of this temporary wardship proceeding. However, since we find the termination of parental rights proceeding to have been proper, and since a determination on the merits of Gard's challenge to the temporary wardship proceedings would have no effect on the termination of parental rights proceeding in this case, it is unnecessary for us to consider the issues raised by this appeal concerning the temporary wardship proceedings. See *Terry* v. *Terry* (1974), 161 Ind. App. 293, 315 N.E.2d 379.

Gard also contends on appeal that IC 1971, 31-3-1-7 (Burns Code Ed) is unconstitutionally vague. Gard cites no authority in support of this argument waiving any contention of error on appeal. Indiana Rules of Procedure, Appellant Rule 8.3(A)(7); *Williams* v. *State* (1973), 260 Ind. 237, 294 N.E.2d 793; *Offutt* v. *Sheehan* (1976), 168 Ind. App. 491, 344 N.E.2d 92. We also note that the record before this Court fails to disclose that the constitutional question was properly presented to the trial court. The first mention of Gard's constitutional vagueness challenge to IC 1971, 31-3-1-7 is in her motion to correct errors. Questions regarding the constitutionality of a statute must be raised in the trial court before the filing of the motion to correct errors. *Linville* v. *Shelby County Plan Commission* (1972), 258 Ind. 467, 281 N.E.2d 884. Therefore, Gard's argument concerning the constitutionality of IC 1971, 31-3-1-7 has not been properly preserved for consideration on appeal.

partment agents took pictures which were admitted into evidence. On appeal, Gard contends that these visits constituted illegal searches in violation of the Fourth Amendment and that any evidence obtained during these visits should have been excluded by the trial court.

One of the visits occurred on January 4, 1974. After Gard's marriage to Arnold Gard, she resided in a mobile home near Roanoke, Indiana. She had been working with Marilyn Killen, a caseworker for the Huntington County Department of Public Welfare. On January 4, 1974, Killen visited the mobile home, and at the termination proceedings she testified regarding the condition of the interior of the trailer. There was no objection to her testimony. Failure to object to Killen's testimony at trial waives any allegation of erroneous admission of evidence on appeal, *Harrison* v. *State* (1972), 258 Ind. 359, 281 N.E.2d 98; *Thomas* v. *State* (1975), 164 Ind. App. 647, 330 N.E.2d 325, and we will not consider this issue under the fundamental error doctrine. See *Winston* v. *State* (1975), 165 Ind. App. 369, 332 N.E.2d 229.

Gard has properly preserved her allegations of error concerning the remaining three visits by welfare department agents. Assuming *arguendo* that the other three visits by welfare department agents violated Gard's Fourth Amendment rights and that evidence obtained in violation of those rights should have been excluded at the termination proceedings, we find any error in the admission of this evidence to be harmless.

Because the trial court may have considered this evidence, we must consider whether this possible Federal constitutional error would be harmless beyond a reasonable doubt. *Chapman* v. *California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *Greer* v. *State* (1969), 252 Ind. 20, 245 N.E.2d 158; *Moreno* v. *State* (1975), 166 Ind. App. 441, 336 N.E.2d 675; *Larimer* v. *State* (1975), 163 Ind. App. 673, 326 N.E.2d 277. As explained in *Moreno* v. *State, supra,*

336 N.E.2d at 681, in determining whether the federal constitutional error was harmless beyond a reasonable doubt, we must consider both the probative impact of the illegally obtained evidence upon the trial court and the amount and probative value of the other evidence in the record supporting the trial court's decision.

The first of these allegedly illegal searches occurred on May 11, 1972, when Lieutenant Michael Holly of the Allen County Board of Public Health visited Gard's apartment and took numerous pictures of the interior of the apartment. Before the admission of these photographs, Holly testified without an objection on illegal search grounds to the conditions depicted by the photographs. Even if the photographs taken by Lieutenant Holly were erroneously admitted into evidence, they were merely cumulative of other evidence admitted without proper objection. See *Jenkins* v. *State* (1975), 263 Ind. 589, 335 N.E.2d 215; *Boles* v. *State* (1973), 259 Ind. 661, 291 N.E.2d 357.

The second visit occurred on June 22, 1972, when Frances Milan, Gard's caseworker from June 1972, to October 1972, visited Gard's apartment at Westfield Village. This visit took place after the Gard children had been made temporary wards of the Allen County Department of Public Welfare and had been removed from the home. Milan testified at the termination proceedings regarding the condition of the Gard apartment at the time of the visit.

The third visit occurred on January 17, 1974, when four welfare department agents visited the Gard trailer. Two of the Gard children were living in the home at this time. Two of the welfare agents testified over timely objection regarding the condition of the trailer. Pictures taken during the visit were admitted over timely objection.

The testimony and pictures alleged by Gard to have been obtained in violation of her Fourth Amendment rights were merely cumulative evidence of Gard's inability to keep her home in a condition suitable for maintaining the health and welfare of children. Under Issue

Three concerning the sufficiency of the evidence to support the trial court's judgment, we have set out in detail the other evidence presented at the termination hearing concerning the conditions existing in the Gard home. Considering all the other evidence concerning the conditions in the Gard home from February 11, 1972, to January 17, 1974, we conclude that the impact of the illegally obtained evidence was probably minimal, and the other evidence presented at the termination proceeding was clearly sufficient to sustain the trial court's judgment terminating Gard's parental rights. The admission of this allegedly illegally obtained evidence would have been harmless error beyond a reasonable doubt.

## II.
### Notice

On January 25, 1974, the Allen County Department of Public Welfare petitioned the trial court to have the Gard children "found to be dependent and neglected children and be made wards of the County Department of Public Welfare for all purposes including adoption." Gard was served with summons informing her that the hearing on the above petition was a hearing concerning the removal of her children from her care, custody, and control "for all purposes including adoption." Gard's contention that this was constitutionally insufficient notice of a termination proceeding in violation of due process is without merit. In *Perkins* v. *Allen County Dept. of Public Welfare* (1976), 170 Ind. App. 171, 352 N.E.2d 502, the Allen County Department of Public Welfare also sought to make certain children "wards of the County Department of Public Welfare for all purposes including adoption." In *Perkins, supra,* this Court specifically rejected the Perkins' argument that such notice was constitutionally inadequate and held that the language here at issue was sufficiently explicit to notify a parent that the proceeding was one to terminate parental rights. The holding in *Perkins, supra,* is dispositive of the notice issue presented by this appeal.

### III.

#### Sufficiency of the Evidence

In considering the sufficiency of the evidence to support the trial court's judgment terminating Gard's parental rights, we may not weigh the evidence nor judge the credibility of the witnesses. Also, as pointed out under Issue One, we will not consider the evidence allegedly illegally obtained by welfare department agents.

The evidence most favorable to the Allen County Department of Public Welfare establishes the following. On February 11, 1972, Officer Holly of the Allen County Board of Public Health visited Gard's home and described the conditions that he observed as follows:

"I was there on February 11th, 1972. . . . The place was full of roaches. All the rooms were full of old clothing, old rags, human waste, soiled clothing, garbage, trash, debris lying all around. There was a huge pile of garbage in the kitchen. At the time, I asked Mrs. McAfee (Mrs. Gard) where the children slept, and she stated that they slept on the floor in the house. What prompted me to ask her where they slept was that one of the bunk beds was completely packed full of clothing from the bunk bed clear to the ceiling, you know, just completely packed full of old clothing. There was a terrible stench in the apartment at the time, and it was extremely hot. There was a stench of garbage, waste, human waste, this sort of thing. . . ."

Officer Holly also visited the Gard home on May 11, 1972, and observed similar conditions.

In May 1972, Gard asked her current caseworker, Mr. Ainsley, if her children could be placed in foster homes and the children were removed from her home and made temporary wards of the Allen County Department of Public Welfare. From June 1972, to October 1972, Frances Milan of the Allen County Department of Public Welfare was Gard's caseworker. Milan had several conferences with Gard during June 1972, and Gard indicated that she had some problems with drinking alcoholic beverages. During June 1972, Milan arranged a visitation between Gard and her children at Gard's

request, but no further visitations were requested by Gard between June and October 1972.

From October 1972, to October 1973, Rebecca Thompson of the Allen County Department of Public Welfare worked with Gard. Thompson obtained permission from Gard to make weekly home visits between January 1973, and September 1973. During these home visits, Thompson and Gard discussed Gard's drinking problem, and Thompson worked with Gard on housekeeping and basic nutrition. Thompson testified that when she began the home visits in January, ". . . [T]he home was in a deplorable state. There was raw garbage in the house, trash, junk, the home had a stench which I felt possibly might have come from the dog that was in the home. On my first visit into the home there was food particles laying all over the house, and there was not a place for me to walk. . . ." By March 1973, there was a slight improvement in the condition of the home and on June 22, 1973, the two younger Gard children were placed back in the Gard home. Thompson continued working with Gard on a weekly basis instructing Gard on child care. On July 24, 1973, during Thompson's weekly visit, she observed the folowing:

"On July 24th, I returned to the home, again on a weekly visit, and I again found Mrs. Gard drinking. On this visit she, in my opinion, was intoxicated—she was having difficulty talking with me—the children were not dressed, the bugs were back in the home, again there was raw garbage, the open containers of food, dishes standing that had not been washed. . . ."

Thompson also testified that on subsequent visits on August 2, 1973, and August 10, 1973, the Gard home was in a filthy state. Thompson continued working with Gard through September but testified that her efforts seemed futile. In October 1973, the Huntington County Department of Public Welfare took over the Gard case.

On January 4, 1974, Marilyn Killen of the Huntington County Department of Public Welfare visited the Gard trailer. She testified as follows to the conditions she observed:

"The kitchen was all cluttered, you couldn't see the kitchen table or the counter or the sink. There wasn't anywhere to sit—there were cobwebs around—in the corners—there were spider eggs in them. There was clothes everywhere and food scraps. And she showed us the trailer, and on the way back to the children's bedrooms there were empty beer cases that had to be kicked out of the way or stepped over. The children's room was messy and cluttered with toys and clothes again. There were blood stains on the sheets, and Mrs. Gard said that he (Mrs. Gard's son Charles) had had another nose bleed and that she was almost out of the salve that she was using. There was all kinds of food and orange peels on the floor in the bedrooms."

Besides testimony concerning conditions in the Gard home, there was also evidence presented at trial concerning the school attendance of the older Gard children. Mrs. Ricks, attendance caseworker for the Fort Wayne Community Schools, first became acquainted with the older Gard children because of their lack of school clothing and the infrequency of their school attendance. Both children were chronically absent from school and because of chronic absenteeism, Milton, the oldest, was still in the first grade at age ten. Also, the foster mothers of the Gard children testified that the children were very dirty when first brought to them and needed training in personal hygiene. Both foster mothers testified that the children showed improvement in their health and ability to care for themselves during foster home care.

During the termination proceeding, the State had the burden of proving the Gard children were dependent and neglected children within the meaning of IC 1971, 31-5-7-5 (Burns Code Ed.) and IC 1971, 31-5-7-6 (Burns Code Ed.).[2] Once the State established that

---

2. IC 1971, 31-5-7-5 (Burns Code Ed.) provides:
"The words 'dependent child' as used herein, or in any other statute concerning the care, custody or control of children, shall mean any boy under the age of eighteen [18] years or any girl under the age of eighteen [18] years, who is a dependent upon the public for support, or who is destitute, homeless or abandoned."

IC 1971, 31-5-7-6 (Burns Code Ed.) provides:
"The words 'neglected child' as used herein, or in any other statute concerning the care, custody or control of children shall mean any

the children were dependent and neglected, the State had the additional burden of proving that it was in the best interests of the Gard children to terminate Gard's parental rights. *See Perkins* v. *Allen County Department of Public Welfare, supra.* The trial court made the following findings of fact concerning the termination of Gard's parental rights:

"From the evidence presented, the court finds the facts to be as follows:

1. That said children have been neglected and are dependent.

    a. No paternal interest has been shown for a long period of time, exceeding two years, and no support has been paid.

    b. The children have been in and out of foster homes because of the inability of the mother to care for the children.

    c. The children's rights to an education have been neglected by the mother.

    d. The mother has, for several years, had a problem with alcoholic beverages.

    e. The children's rights to adequate and habitable living quarters has been neglected, largely due to the unwillingness or inability on the part of the mother to use reasonable standards of cleanliness and neatness in her housekeeping standards.

    f. The rights to proper medical care have been neglected.

2. The mother has failed to use or benefit from the efforts of the Department of Public Welfare and other agencies to improve the housekeeping standards which were no better on the last visit than on earlier visits.

---

boy under the age of eighteen [18] years or any girl under the age of eighteen [18] years who:
    (1) Has not proper parental care or guardianship;
    (2) Is destitute, homeless or abandoned;
    (3) Habitually begs or receives alms;
    (4) By reason of neglect, cruelty or disrepute on the part of parents, guardians or other persons in whose care the child may be is living in an improper place;
    (5) Is in an environment dangerous to life, limb, or injurious to the health or morals of himself or others.
"However, such a child receiving care from an authorized agency need not necessarily come to the attention of the court."
The 1976 Amendment of IC 1971, 31-5-7-5 (Burns Code Ed. 1976 Supp.) is inapplicable to this appeal.

3. The children have shown improvement in physical and mental development while in foster homes, which conditions regressed during placement and visits with the mother and stepfather.

4. The efforts to curb the reliance on and influence of alcoholic beverages have met with no success, but the problems continue unabated, according to the evidence and proof.

· 5. The court further finds that in the custody of the mother the children have practically no chance of becoming adjusted, self-sufficient members of society, but that in another home of stability and order they have a good chance of attaining adjustment and successful lives.

6. That if adopted, the children's chances of success in life are much greater, and the chances of adoption are better now that at a later time."

In *Perkins, supra,* 352 N.E.2d at 509, this Court enunciated the following factors which should be considered by the trial court in determining whether parental rights should be terminated:

1. Whether there is a protracted history of dependency or neglect by the parents as defined by statute;
2. Whether there is a substantial probability of such dependency or neglect in the future;
3. Whether it is in the best interest of the child's future welfare to terminate the parental relationship.

Clearly the evidence most favorable to the Allen County Welfare Department supports the trial court's determination that the Gard children were neglected and that it was in their best interests to terminate Gard's parental rights. It is clear from the above trial court findings that the trial court considered the factors enunciated in *Perkins, supra,* in determining the best interests of the Gard children. There is certainly sufficient evidence of a protracted history of neglect by Gard and a substantial probability of such neglect in the future. The trial court's determination that it was in the best interest of the Gard children's future welfare to terminate Gard's parental relationship is supported by the evidence.

This is not a case of mere "dirty housekeeping" as contended by Gard. There was substantial evidence that Gard's child care techniques were detrimental to the health of her children. We do not agree with Gard's contention that the trial court cannot consider past neglect in making its decision to terminate parental rights. Clearly an adjudication that a child is dependent and neglected may not be based solely on conditions which existed in the distant past but no longer exist. See *Adams* v. *Herd* (Tex. Civ. 1975), 526 S.W.2d 295. However, in the case at bar, there is evidence of recurring child neglect up until the time the children were removed from the Gard home in January 1974.

Also, we cannot agree with Gard's contention that the trial court must make a finding of dependency and neglect existing at the time of the hearing on termination of parental rights. In most termination cases, as in this case, the children have been removed from the parents' custody before the termination hearing. It would be impossible to show that the children were currently neglected by their parents under these circumstances. To hold the State to such a burden of proof would make termination of parental rights impossible. We agree that the parents' fitness to care for their children should be determined as of the time of the hearing. The trial court must consider evidence of changed conditions. However, this evidence of changed conditions must be considered in light of the history of neglect by the parents and the probability of a repetition of neglect.

Although Gard presented some evidence that the condition of her home improved after the children were taken in January 1974, this evidence must be viewed in light of the testimony of caseworker Thompson. She testified that there were periods of slight improvment in Gard's housekeeping and child care, but she always regressed to her previous inadequate child care techniques. There was substantial evidence to support the trial court's determination that Gard would not be able to adequately resume her parental duties in the future.

Therefore, the judgment of the trial court terminating Gard's parental rights should be and the same hereby is affirmed.

Hoffman, J., concurs with opinion; Garrard, J., dissents with opinion.

### CONCURRING OPINION

HOFFMAN, Judge.—I concur in the majority opinion except insofar as it implies that the Fourth Amendment's proscription applies in civil matters. Dependency and neglect proceedings in juvenile court fall within the civil area. I do not believe the exclusionary rules of evidence apply in such civil proceedings.

I concur in the affirmance of the judgment of the trial court.

### DISSENTING OPINION

GARRARD, J.—For the reasons announced in my opinion in *Perkins* v. *Allen County Department of Public Welfare* (1976), 170 Ind. App. 171, 352 N.E.2d 502, I dissent and would vacate that portion of the order permanently terminating all parental rights of Mrs. Gard.

NOTE.—Reported at 352 N.E.2d 797.