**Judith ALEXANDER, Appellant
(Respondent below),**

v.

**LA PORTE COUNTY WELFARE
DEPARTMENT, Appellee
(Petitioner below).**

No. 3–883A278.

Court of Appeals of Indiana,
Third District.

June 28, 1984.

R. Steven Bom, Barbara S. Friedman, LaPorte, for appellant.

Phyliss A. Benn, LaPorte, for appellee.

STATON, Presiding Judge.

In March 1981, Alexander's daughter, Jovetta, was declared a "Child in Need of Services".[1] In March 1983, Alexander's parental rights to Jovetta were involuntarily terminated pursuant to IC 31–6–5–4.[2] On appeal, Alexander raises the following issues:

I. Whether the evidence was sufficient to support the finding that there was a reasonable probability that the condition which resulted in Jovetta's removal from the home would not be remedied; and,

II. Whether parental rights may be terminated because of abusive acts committed by one other than a parent.

We affirm.

I.

Probability of Remedy

IC 31–6–5–4 provides:

---

1. Indiana Code 31–6–4–3 (Burns Code Supp. 1983).

2. (Burns Code Supp.1983).

"31-6-5-4. Termination of parent-child relationship involving delinquent child or child in need of services.—A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile or probate court only by the attorney for the county department or the prosecutor; that person shall represent the interests of the state in all subsequent proceedings on the petition. The probate court has concurrent original jurisdiction with the juvenile court in proceedings on the petition. The petition shall be entitled 'In the Matter of the Termination of the Parent-Child Relationship of _____, a child, and _____, the child's parent (or parents)' and must allege that:

(1) The child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) There is a reasonable probability that the conditions that resulted in the child's removal will not be remedied;

(3) Termination is in the best interests of the child; and

(4) The county department has a satisfactory plan for the care and treatment of the child...."

Alexander alleges the evidence did not support the court's finding that there was a reasonable probability that the condition which led to Jovetta's removal from Alexander's home would not be remedied. In considering whether the evidence was sufficient to support the finding, we will neither reweigh the evidence nor judge the credibility of witnesses. *Wardship of Bender* (1976), 170 Ind.App. 274, 352 N.E.2d 797. Only the evidence most favorable to the judgment will be considered. *Id.*

The evidence most favorable to the La-Porte County Department of Public Welfare (DPW) is as follows. When Jovetta was nine months old, Alexander began living with her boyfriend, David Martinez, and has lived with him continuously since. Soon after, Alexander contacted the DPW and requested that Jovetta be placed for adoption. She was referred to another agency. One year later, the DPW was notified of a police report alleging neglect of Jovetta. The record reveals that at that time Jovetta had lost her ability to walk and was losing her hair.

The DPW had temporary wardship of Jovetta between March 1977 and June 1978, although Jovetta remained in Alexander's home. A pediatrician who examined Jovetta in March 1977 testified that at that time Jovetta's condition constituted "severe failure to thrive." Jovetta was hospitalized. The day after her release, she was seen again by the pediatrician whose examination revealed extensive, fresh bruises on Jovetta's face and back.

Medical records dated August 1980 indicate "possible child abuse". Jovetta's left cheek was reddened; at the time, Alexander stated that Jovetta had fallen.

In January 1981, the DPW removed Jovetta from Alexander's home after a report from Jovetta's school principal of suspected child abuse. A DPW caseworker reported that on that day Jovetta had a large red mark on her cheek and that the bridge of her nose was swollen. Her forehead was bruised and scraped, she had a black eye, and there was a large lump on the back of her head. Alexander told the caseworker that the injuries were a result of Jovetta's fall while getting out of the car that morning. Jovetta told the pediatrician that she had been struck and pushed down by Martinez.

The pediatrician examined Jovetta further and discovered hypertrophic burn scars on her legs and buttocks which were "secondary to deep third degree burns that had long since healed". Jovetta told the pediatrician that she had been forced by Martinez to sit on a hot radiator. The pediatrician found Alexander's explanation, that Jovetta had backed into the heater, to be "totally implausible". Alexander admitted that the burns had occurred at a time when Martinez was babysitting with Jovetta.

Jovetta's foster mother testified that Jovetta reported to her that Martinez had, in

the past, put shampoo into Jovetta's eyes and mouth, had put her head in the toilet, and had burned her finger by holding it over a lighter. At trial, Alexander admitted that perhaps Martinez had "over-punished" Jovetta. She testified that Martinez had "over-whipped" Jovetta and that Alexander realized that Martinez "just went a little too far sometimes".

There was considerable testimony at trial that Jovetta had become a severely disturbed child as a result of the abuse. A foster parent testified that Jovetta was afraid of Martinez and never wanted to see him again. She testified that just prior to the termination hearing Jovetta had stated, "I'm scared because I have to go back to my mother and Dave (Martinez)".

After Jovetta was taken from Alexander's custody, Alexander signed a six-month agreement with the DPW agreeing to participate in weekly counseling and Parents Anonymous. She agreed to cooperate in protecting Jovetta from her abuser, Martinez, to visit with Jovetta at least once every two weeks, and to contact her caseworker every two weeks regarding her progress toward the goal of regaining custody of Jovetta. She agreed that if she continued to live with Martinez she would actively help him "work toward a non-abusive way of dealing with Jovetta".

Alexander attended counseling sessions, but when asked by a DPW worker whether she had made progress with Martinez regarding his abusive treatment, Alexander reported that she had not. A caseworker testified that it was intended that Martinez would participate in the counseling with Alexander. He missed scheduled sessions during June of 1981, and attended only two of the scheduled sessions in August. Alexander told the DPW that Martinez would not attend meetings and that he would not visit Jovetta or work toward a "non-abusive way of dealing with her". Alexander stated that she had become "frustrated and upset when he wouldn't attend and felt fairly powerless, actually helpless to encourage him".

After Alexander's and Martinez' third child was born, Alexander did not see Jovetta for approximately nine months. During that time, Alexander again indicated her desire to place Jovetta for adoption; just after Jovetta had been removed from the home, Alexander had told a DPW worker that "if she could not keep Jovetta from being abused, then she would consider placing Jovetta with friends or relatives". In March 1982, when Alexander discussed adoption with a caseworker, she offered the caseworker no indication of progress with Martinez. Alexander signed a consent to adoption in October, 1983.[3]

Throughout the period of time after Jovetta was removed from Alexander's home, she expressed great fear at the prospect of returning to Alexander's home. The trial court heard testimony from a psychologist that, statistically, abuse can be expected to recur in a home where conditions have not changed; that is, if the abuser still resides there and changes have not been brought about through counseling.

Alexander argues that there was insufficient evidence that the condition which led to Jovetta's removal from the home, i.e., Martinez' abuse, was still a condition at the time of the hearing. In *In Wardship of Bender, supra,* 352 N.E.2d 797, we wrote:

> "Also, we cannot agree with Gard's contention that the trial court must make a finding of dependency and neglect existing at the time of the hearing on termination of parental rights. In most termination cases, as in this case, the children have been removed from the parents' custody before the termination hearing. It would be impossible to show that the children were currently neglected by their parents under these circumstances. To hold the State to such a burden of proof would make termination of parental rights impossible. We agree that the parents' fitness to care for their children should be determined as of the time of the hearing. The trial court must consider evidence of changed conditions.

**3.** Alexander later revoked her consent, claiming it was procured through fraud.

However, this evidence of changed conditions must be considered in light of the history of neglect by the parents and the probability of a repetition of neglect." *Id.* at 804.

We conclude that the evidence was sufficient to support the finding of a reasonable probability that the conditions which led to Jovetta's removal would not be remedied. The trial court had no evidence before it that Martinez' abusive tendencies were corrected. We held in *Perkins v. Allen County Department of Public Welfare* (1976), 170 Ind.App. 171, 352 N.E.2d 502, that:

> "Once the child is found to be a 'dependent child', and the parental relationship is severed, the change of the state of mind, habits, and circumstances of the parent essential to provide a fit home for the child is a matter solely up to the parent. *The burden of going forward with the evidence* should be, and is, upon the parent to show such a change of conditions and reformation that the best interests of the child would be served by returning the child to the parent. (Emphasis added.)" *Id.* 352 N.E.2d at 510.

That burden was not met.

## II.

### Parents' Responsibility for Another's Abuse

Alexander argues that one's parental rights should not be threatened because of the abusive acts of others. She points out that Indiana's law of termination of parental rights contemplates *parental* acts of neglect or abuse before termination. Alexander resolves the issue herself when she quotes in her brief from *Perkins, supra,* 352 N.E.2d 502, as follows:

> "[F]urther, such natural rights and interests should not be terminated, absent parental acts *or omissions....*" (Emphasis added.)

*Id.,* at 509; *see also* IC 31–6–4–3(a)(2) and IC 31–6–4–3(b). Alexander's omission was in failing to protect Jovetta from her abuser.

Alexander goes on to argue that she did not commit an omission because she did not know that Martinez was abusing Jovetta. Without reweighing the evidence, we find it sufficient to show that Alexander was aware of the cause of her daughter's injuries.

We affirm.

HOFFMAN and GARRARD, JJ., concur.