In re the WARDSHIP OF M.H., D.R., J.R., and F.R.

Patricia RUSSELL, Appellant (Respondent Below),

v.

ALLEN COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee (Petitioner Below).

No. 3–385A68.

Court of Appeals of Indiana, Third District.

Dec. 11, 1985.

James M. More, Bloom & Bloom, Fort Wayne, for appellant.

Kenneth L. Scrogham, Fort Wayne, for appellee.

Karen E. Richards, Hoffman & Moppert, Fort Wayne, Guardian Ad Litem for M.H., D.R., J.R. and F.R.

HOFFMAN, Judge.

Patricia Russell (Russell) appeals the judgment of the Allen County Superior Court which terminated her parental rights to her four children: M.H., D.R., J.R. and F.R. As stated in appellant's brief, three issues are presented on appeal:

"A) [w]hether the court erred in admitting photographic evidence of conditions in Parent's home as they existed on December 22, 1981, which evidence was utilized as a basis for terminating parental rights[;]

B) [w]hether the reasons for removal of each child from the Parent should be considered separately in termination proceedings[;] [and]

C) [w]hether there was clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the children's removal would not be remedied."

The facts as established at the termination hearing indicate that on December 22, 1981 the Allen County Department of Public Welfare (DPW) visited the Russell residence pursuant to a complaint received by that agency. Upon seeing the condition of the residence, Russell was placed under arrest for possible child neglect. Photographs of the residence taken by Public Health employees revealed extremely unhealthy and unsanitary conditions. The three children living in the home, M.H., D.R. and J.R., were removed from the home and placed in foster care.[1]

On January 18, 1982 the three children were declared Children in Need of Services (CHINS) pursuant to a petition filed by DPW. The parents, Patricia Russell, the natural mother of all the children, and Fred Russell, the natural father of D.R. and J.R. and the stepfather of M.H., entered into a Parent Participation Plan in March 1982 at a dispositional hearing. The plan stipulated the things required of the Russells in order to have the children returned. The requirements included insuring sanitary and healthy living conditions; proper feeding, clothing and medical care; acceptance of homemaker services and cooperation with the DPW caseworker. The children were ordered placed in foster care.

In July 1982 the children were returned to their parents by DPW. Testimony indicated this change was made because Russell had moved into an apartment and the home was no longer a health hazard; Russell was no longer living with her husband and homemaker services were being provided. The return of the children was without the authorization of the court and did not entail a court order nor a change of custody.

In October 1982 M.H. was again removed from the home due to alleged sexual abuse by her stepfather. Fred Russell was arrested and subsequently sentenced to eight years imprisonment. M.H. was placed in foster care again. A fourth child, F.R., had been born in September 1982 and he and D.R. and J.R. remained with Russell. As a result of these events, a modification hearing was held resulting in a new Parent Participation Plan which pertained only to Patricia Russell. This plan contained the requirements of the previous plan plus it required Russell to protect and supervise the children; avoid leaving them unattended; cooperate with staff working with D.R.;[2] complete parenting classes; be psychologically evaluated and follow counseling recommendations; properly dress children; and maintain visitation with M.H.

In September 1983 DPW filed a petition to allow M.H. to return to her mother's care, and a new participation plan covering the previously stipulated areas of concern and requiring continuation of counseling for M.H. if she returned home. However, in October 1983 the Guardian Ad Litem filed a petition to have D.R. and J.R. removed from the home again. The two girls were removed, leaving only F.R. with Russell. The reasons for the removal of D.R. and J.R. were non-compliance with the December 1982 plan; non-education of the children to the point they could not speak intelligibly; attendance at school by D.R. in dirty, ill-fitting, inappropriate clothing with improper personal hygiene and lack of proper amounts of sleep; signs of physical abuse to D.R. by way of bruises and handprints and bite marks; lack of cooperation with D.R.'s teachers; and endangerment of the physical and mental condition of the children.

DPW then filed a petition to have F.R. declared a CHINS alleging failure by Russell to maintain adequate housekeeping, provide proper hygiene or protect the child from harm.[3] At a December 21, 1983 hear-

---

1. The two older children, M.H. and D.R., had previously been placed in foster care from August 3, 1978 to November 8, 1978 with wardship terminated on October 21, 1980.

2. D.R. is moderately mentally handicapped and suffers from a form of cerebral palsy and is epileptic.

3. F.R. had received a burn across his cheek resulting from having access to a hot popcorn pan.

ing, Russell admitted the allegation of neglect; F.R. was declared a CHINS and foster care was ordered for F.R. and ordered continued for the other three children. The new plan entered into at this time covered the items addressed in the previous plans but also set up a specific schedule for housekeeping and laundry and required Russell to receive services as to budgeting money, developing sleep schedules, giving daily baths and preparing nutritional meals.

In March 1984, Russell moved from the apartment into the home of a friend. In June the friend asked Russell to leave due to her lack of cleanliness about herself and the home. She then moved to the Inner City Mission, a home for people who have no home and was a resident there at the time of the termination hearing.

In reviewing the trial court's decision, the appellate court will not reweigh the evidence nor judge the credibility of witnesses. We consider the evidence most favorable to the judgment, keeping in mind the fact that the DPW must present clear and convincing evidence to support every element of IND.CODE § 31–6–5–4 [4] which provides the statutory criteria for termination of parental rights. *J.K.C. v. Fountain County Dept. of Pub. Wel.* (1984), Ind.App., 470 N.E.2d 88, 91.

Appellant alleges error by the trial court due to the admission into evidence of the photographs of the residence on December 22, 1981. Appellant urges that the conditions depicted in the photographs were remedied by July 1982 as evidenced by the return of the children to her care. There-fore any involvement by DPW after July 1982 was predicated on new conditions which render the December 1981 conditions irrelevant.

■ Since DPW must show by clear and convincing evidence that the conditions which resulted in the removal would not have been remedied, *J.K.C. v. Fountain County Dept. of Pub. Wel.*, *supra*, the reason for the removal is a material fact. Evidence is relevant which has a logical tendency to prove that fact. *McClamroch v. McClamroch* (1985), Ind.App., 476 N.E.2d 514, *trans. denied.* The pictures were therefore relevant to prove the condition of the residence in December 1981, and contrary to appellant's argument, the December 1981 removal is the action which culminated in the termination hearing. Therefore, evidence of the conditions which led to that removal was admissible.

The effect of the return of the children to the home during an ongoing involvement was addressed in *Matter of Miedl* (1981), Ind., 425 N.E.2d 137. In *Miedl* each of two children had been removed from the care of the parent shortly after birth due to the mother's psychological problems. Each child had been returned to the mother's care at least once before termination proceedings were instituted. Although the issue in *Miedl* concerned application of the proper statute, the application of the proper statute hinged on whether or not the return of the children constituted a disposition of the initial involvement and the subsequent involvement of a new case. The Supreme Court set out the findings of the trial court indicating the return of the chil-

---

4. IND.CODE § 31–6–5–4 provides:

"Petition for termination of rights; delinquent child or child in need of services

Sec. 4. A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile or probate court only by the attorney for the county department or the prosecutor; that person shall represent the interests of the state in all subsequent proceedings on the petition. The probate court has concurrent original jurisdiction with the juvenile court in proceedings on the petition. The petition shall be entitled 'In the Matter of the Termination of the Parent-Child Relationship of ——, a child, and ——, the child's parent (or parents)' and must allege that:

(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied;

(3) termination is in the best interests of the child; and

(4) the county department has a satisfactory plan for the care and treatment of the child."

dren was on an oral order with no entry or change of status in the records. The Court stated:

"They had been in the physical custody of the Welfare Department for well over a year preceding the judgment, with the exception of the trial period the trial judge gave to Glenda in February and March. As the trial judge said in his order, this was a total failure. It was, however, an attempt to try to work with the parent and test her ability to function as a parent. It certainly is not reasonable to say now that this broke the chain of events to such an extent that to properly follow the law we need to start over again with a new six month period. Custody had not been changed in the orders of the court to give the mother physical custody. This was merely a temporary unofficial placement with the mother in an attempt to work with her as the law contemplates. It is certainly not grounds to reverse the judgment of the trial court." *Matter of Miedl, supra,* 425 N.E.2d at 140.

As in *Miedl,* the return of the children to Russell did not interrupt the chain of events commencing with the removal in December 1981 and culminating with the termination hearing in December 1984. Therefore, the photographs depicting the condition of the home on December 22, 1981 were admissible to establish the conditions which resulted in removal and which the DPW had to show would probably not be remedied.

■ Appellant next argues that the reasons for removal of each child should be considered separately in a termination proceeding, and IND.CODE § 31-6-5-4(2) should be read as requiring such. Expressing no opinion as to a situation where children are removed for different reasons, the appellant's argument is inapplicable in the present case since all the children were removed for the same basic reasons. As stated above, the conditions which led to removal of the three older children in 1981 were inadequate housekeeping, sanitation and basic care of the children. The same

conditions led to the removal of F.R. and the second removal of D.R. and J.R. in 1983. Even though M.H. was removed in the interim due to sexual abuse by her stepfather, the initial, common and recurring conditions of unsanitary and unhealthy residences and lack of proper parental care maintained for all the children as the condition requiring DPW involvement. Therefore separate stipulations and consideration of conditions leading to removal and any subsequent remedy would not be necessary here.

Finally, the appellant argues that DPW did not show by clear and convincing evidence that the conditions which led to removal would probably not be remedied. The clear and convincing standard is required as to each element of the statutory requirements for termination, *Santosky v. Kramer* (1982) 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599; *Ellis v. Knox County Dept. of Public Welfare* (1982), Ind.App., 433 N.E.2d 847.

However, the appellant also had an obligation to present proof of her ability to remedy the conditions leading to the children's removal. In *Alexander v. LaPorte Co. Welfare Dept.* (1984), Ind.App., 465 N.E.2d 223, 226, the procedural posture was stated as had been stated in *In re Perkins v. Allen Co. Dept. Pub. Welfare* (1976), 170 Ind.App. 171, at 184, 352 N.E.2d 502, at 510:

" 'Once the child is found to be a "dependent child," and the parental relationship is severed, the change of the state of mind, habits, and circumstances of the parent essential to provide a fit home for the child is a matter solely up to the parent. The burden of going forward with the evidence should be, and is, upon the parent to show such a change of conditions and reformation that the best interests of the child would be served by returning the child to the parent.' "

As is required, evidence at the hearing addressed habitual patterns of living to establish no reasonable probability of change in conditions, as well as fitness of the parent at the time of the hearing. DPW has

presented sufficient evidence to meet the clear and convincing standard of proof by the recounting of three years of services and assistance provided Russell without significant improvement in her ability to care for her children.

Homemaker services were provided from 1982. These services included assistance in providing necessary food for the children and instruction on housekeeping, parenting, nutrition and budgeting. After two years of working with Russell, there was only minimal improvement in picking up the house and Russell was never able to handle laundry requirements incident to a family.

Catholic Social Services provided assistance which was begun in 1976. Russell sought help from the agency each time she encountered a crisis. The agency provided, at some point, clothing, rent, food, utility payments, transportation and counseling. Testimony of agency personnel indicated they saw no improvement in Russell during the years of assistance and hoped only to maintain her position and keep her "head above water."

Testing services were provided at Park Center. The conclusions of the professionals involved indicated counseling would be of no benefit to Russell as she did not realize nor accept that she was the source of her own difficulties. Further, she was found unable to bring up others on her own but was thought capable of functioning if provided continual assistance, support and guidance. It was recommended that Russell attend parenting classes. She involved herself with the program for two years, intermittently, and after some 38 sessions was still unable to understand the basic concepts presented for proper parenting.

The Salvation Army provided services for Russell in the form of rent money, food, clothing and soaps.

After Russell's children were removed from the home, a friend allowed Russell to stay in her home. After a short time however, the friend asked Russell to leave because of her lack of personal hygiene, her refusal in helping to keep the residence clean and her treatment of her children which the friend found abusive and unacceptable.

DPW also presented evidence of difference in the lives of the children when removed from Russell. D.R.'s teacher [5] testified as to D.R.'s lack of skills in language, math and other academics as well as self-help when living with Russell. She testified as to the fact the child's manner of dress was inappropriate, ill-fitting and dirty. She testified as to the lack of cooperation of Russell in getting D.R. into therapy. Testimony showed D.R. frequently arrived at school tired or ill and appeared extremely hungry. Marks indicating physical abuse were found on her body and reported to the agency. She was not receiving her medication needed for her medical problems. However, once D.R. was removed from the home she became more alert and able to concentrate. She would respond to questions at school and had a more pleasant personality. She began taking pride in her appearance wearing clean, coordinated clothing and perfume. As a result she made advances in her amount of verbalization and available vocabulary.

J.R.'s foster parent indicated the child was frightened and unable to articulate except for "baby talk" when she arrived at their home. After constant reassurances, the child began to trust the foster family. Also she learned to speak properly and at an appropriate level for her age. When J.R. returned from visits with Russell, she was smelly and dirty and during one visit had been sexually molested.

M.H. was placed with a psychologist for counseling due to the sexual abuse she received from her stepfather. She was found to be frightened and angry, not just because of the sexual abuse, but because of the lack of nurturing from the time she

---

5. At the time of the hearing, M.H. and D.R. were of school age. J.R. and F.R. were younger and not in school yet.

was an infant. Counseling for two to three more years was recommended.

The youngest child, F.R., was too young to receive outside services. Thus no testimony was available as to his condition.

The above evidence establishes a long history of neglect and the probability of a repetition of such. It therefore became incumbent on Russell to show a change of conditions and reformation sufficient to indicate the best interests of the children would be served by not severing the parent-child relationship. *Alexander v. La-Porte Co. Welfare Dept., supra.*

Russell presented evidence that she was at the time of the hearing residing at the Inner City Mission. Testimony indicated that her personal hygiene had greatly improved; that she was participating in activities and classes; that she was keeping her own area of the facility clean, working in the laundry and helping in the kitchen; and that she voluntarily performed similar tasks for others who had not performed them for themselves. Testimony was also presented to show that Russell had returned to an education program to try to earn her GED.

While this evidence tends to show a change in lifestyle by Russell, it was insufficient to show a reformation and rehabilitation which would enable Russell to maintain a decent home and provide necessary care for her children. Further testimony indicated the Mission was a supervised and very restrictive environment wherein clothing, food and all necessities were provided in return for the resident's performance of daily tasks and attendance in classes and counseling. In addition, the facility was short term in that "people have stayed as long as a year" and would not be a plausible long-term solution for Russell and the children. Such arrangements indicate Russell is capable of caring for herself in a very restrictive, controlled, assisting environment. It shows no changes conducive to raising children on her own.

The most significant evidence showing a lack of change and lack of probability of change for the future is derived from Russell's own testimony. On cross-examination Russell indicated that her only real problem she ever had when the children were at home was the laundry which she could not maintain. The following exchange reveals her lack of conception of the problems:

"Q Did you ever have any problem keeping your house clean?

A No, I don't feel I have."

This was the response of a woman whose home was shown to be absolutely filthy and infested with insects. Additionally, Russell's attitude toward the children as evidenced by the following colloquy is shown to be unreformed:

"Q You had some kids that you had in Ohio, and your rights were terminated to them, weren't they?

A Not to all of them.

Q A couple of them, though, weren't they?

A It was just only two of them in Ohio."

No error having been found and sufficient evidence having been presented to establish by clear and convincing evidence that the conditions resulting in removal of the child will probably not be remedied, the trial court judgment is affirmed.

Affirmed.

STATON, P.J., and GARRARD, J., concur.