Argued June 23, affirmed July 26, reconsideration denied August 25, petition for review denied September 14, 1976

# In the Matter of S., A.M.G., T.G., M.L., Minor Children

## STATE ex rel WASHINGTON COUNTY JUVENILE DEPARTMENT, *Respondent,*

*v.*

## K.M.S., *Appellant.*

### (No. 8531, CA 5091)

552 P2d 578

See also 26 Or App 215, 26 Or App 209, 552 P2d 584, and 552 P2d 586.

[ 219 ]

*Steven M. Rose,* Portland, argued the cause for appellant. With him on the brief was K.M.S., pro se, Portland.

*Karen H. Green,* Certified Law Student, Willamette University School of Law, Salem, argued the cause for respondent Juvenile Department. With her on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Martin Faveluke,* Portland, argued the cause and filed a brief for children.

Before Schwab, Chief Judge, and Foley and Thornton, Judges.

FOLEY, J.

**FOLEY, J.**

The circuit court for Washington County terminated the parental rights of the mother, K.M.S., to three of her children, ages four, three and two. She appeals, assigning two principal grounds for reversal: (1) that the preponderance-of-evidence standard of proof established by ORS 419.525(2) is unconstitutional and (2) that there is insufficient evidence to support the trial court's finding that the mother failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the children for one year prior to the filing of the petition to terminate parental rights on September 19, 1975. ORS 419.523(3).

On April 6, 1974, the police were notified by the manager of Tall Firs apartment in Washington County that the two-year-old child of K.M.S. had been found unattended and half naked near the creek behind the apartment in which the children were living. The 11-year-old sister of the children was responsible for them while the mother was in Portland working. The mother had been gone for several days. After the situation came to the attention of the police, an employe of the Children's Services Division (CSD) visited the apartment and described the conditions which he found:

> "I recall the kitchen, which was the first thing that was off the adjoining entrance, being filled with uncleaned, unwashed dishes. I had an opportunity to open the refrigerator and what I found was a half a bottle of milk that smelled sour and seemed to be fermenting.
>
> "Following that I went in to the living room and I found stacks of dirty, stale, rancid, smelly clothing. I found one piece of furniture which was a chaise lounge, an outdoor chaise lounge which had torn webbing in it and that was the only furniture in the living room.
>
> "I can recollect two bedrooms, each bedroom had a mattress on the floor that was stained and smelly. There was one of the bedrooms that had a new crib in it. Two of

the little children were sleeping on one of the mattresses. There was, through the hall, there was a bathroom on— in the bathroom there were newspapers and on the newspapers there was a little puppy and several mounds of dog defecation. I also recollect a potty-seat that was filled with what appeared to be stale urine.

The entire apartment smelled like the inside of a very rancid diaper pail."

The children were removed from the home and at a preliminary court hearing the next day, April 9, 1974, which the mother attended, the court ordered that a petition be filed and that temporary custody of the children be awarded to CSD. Mrs. Everson, a caseworker, was involved with the placement of the three children and at the request of the mother accompanied K.M.S. to the apartment shortly after the hearing. She recalled a very disorderly house, "* * * a mattress or so on the floor and clothes scattered all about. * * * I had the feeling of dirt. * * * [B]arely any food at all." About 10 days later Mrs. Everson was able to contact the mother at her place of employment, a bar-restaurant in downtown Portland, to ask her about tetanus shots for one of the children who had cut her lip. This was the last time Mrs. Everson was able to contact the mother while she was working on the case. Mrs. Everson was transferred to Multnomah County on October 31, 1974. She testified about her efforts to contact the mother. On May 9, 1974, she wrote the mother, at the address given her by the mother, concerning an appointment for the mother to see the children; the letter was returned. Meantime, Judith Ann Zupan, a CSD caseworker, became involved with the children's care in March 1975. Since the whereabouts of the mother was unknown, her assignment was to attempt to locate her. Zupan told of her unsuccessful efforts to contact the mother through previous addresses, by contacting both Portland and Vancouver police departments, the FBI, the Motor Vehicles Divisions of both Oregon and Washington, and by checking with utility companies. She was also

unable to discover the whereabouts of the mother by contacting the older children of the mother.

The next contact with the mother was on the day before Christmas in 1974 when she suddenly appeared at the CSD office in Portland and demanded immediate visitation with her children. The CSD worker called the Washington County CSD and arranged for the mother to go to Washington County where the children were located and arrange visitation. The mother told the Portland CSD worker that she had some presents for her children and asked if the CSD worker would see to it that they were delivered. The CSD worker agreed, but the mother neither brought the presents nor contacted the Washington County CSD to arrange visitation.

The next appearance by the mother was on April 4, 1975, when she filed a document in the juvenile department of Washington County, referred to as a motion and demurrer. The mother indicated in her discussions with CSD workers that the filing was done at that particular time because the termination statute requires that wilful neglect continue for more than one year.

Although letters were sent to the mother by Mrs. Zupan of CSD requesting contact and suggesting a plan for reintegration of the three children into the mother's home, there was no response from the mother. Finally, in answer to a certified letter, the mother came to the CSD office on June 13, 1975, and demanded immediate visitation with her children. While Mrs. Zupan indicated a willingness to arrange visitation, the mother refused to discuss anything about her whereabouts in the past and also refused to discuss her current situation. She told Mrs. Zupan that she would provide information in the court hearing which was scheduled for June 24, 1975, involving an older minor daughter, but did not appear at that hearing.

In August 1975, Mrs. Zupan testified she wrote

another letter to the mother in which she stated that since none of her contacts for the last 13 months had been such as to lead to the mother's reconciliation with her children, CSD now considered her contacts incidental and was moving through appropriate channels for termination of her parental rights to the three younger children.

A petition for termination of parental rights was then filed on September 19, 1975, and after hearing on January 9, 1976, the testimony from which occupied 545 pages of transcript, the trial court terminated the rights of the mother. She was represented by an attorney at the hearing but chose to cross-examine witnesses, make objections, testify herself, and argue to the court at the conclusion of the testimony.

The court made the following findings:

"* * * * *

"1. [K.M.S.] has failed to provide care or pay a reasonable portion of substitute physical care and maintenance for her children since April 6, 1974, although it has not been shown that she had the ability to do so;

"2. That [K.M.S.] has failed since April 9, 1974, to maintain regular visitation or other contact with the children which was designed and implemented in a plan to reunite the children with the mother, despite being requested and encouraged to visit by Children's Services Division, and has not visited them at all since April 9, 1974, a period of over one year prior to the filing of this petition;

"3. That [K.M.S.] has failed to contact or communicate with the children by telephone, letter or otherwise since April 9, 1974;

"4. [K.M.S.'s] contacts or communication with Children's Services Division (the children's custodian since April 9, 1974, a period of over one year prior to the filing of this petition,) have not been of a substantial nature, but rather are incidental contacts and communications;

"5. [K.M.S.'s] pleadings filed with the Court do present a plan for the return of the children to her care and

custody; however, the Court finds that no attempts have been made to carry it out.

"6. [K.M.S.] has failed to keep Children's Services Division, legal custodian of her children, informed of her whereabouts from April 9, 1974 until April, 1975, and has often been unavailable since April, 1975 despite repeated attempts by Children's Services Division to contact her, and;

"7. [K.M.S.] has failed to cooperate with Children's Services Division who has attempted to aid in implementing a plan for the return of the children to their mother's custody and has demonstrated a lack of interest in providing a permanent and consistent home for the children. Further, all actions by [K.M.S.] since April 9, 1974 have been to fulfill [K.M.S.'s] own personal needs and not those of her children * * *.

"* * * * * *"

The mother first contends that the standard of proof by which the state is permitted to establish a statutory ground for termination of her parental rights deprives her of due process of law under the Fifth and Fourteenth Amendments to the United States Constitution. The challenged staute is ORS 419.525 which, in pertinent part, provides:

"(2) * * * The facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by a preponderance of competent evidence * * *"[1]

---

[1] In its entirety, ORS 419.525 requires that the following procedures be adhered to in a termination proceeding:

"(1) An order pursuant to ORS 419.523 may be made only after service of summons, as provided in ORS 419.488 on the parent or parents. The summons shall contain a statement to the effect that the rights of the parent or parents are proposed to be terminated in the proceeding. The statement may be made in the summons originally issued in the proceeding or in separate summons issued at any subsequent stage of the proceeding.

"(2) A hearing shall be held by the court on the question of terminating the rights of the parent or parents. No such hearing shall be held any earlier than 10 days after service or final publication of the summons. The facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by a preponderance of competent evidence and a stenographic or other report authorized by ORS 8.340 shall be taken of the hearing.

She argues that proof of a statutory ground for termination by "a preponderance of competent evidence" does not adequately protect her parental rights from termination under the Due Process Clause. It is urged that due process compels, at minimum, a standard of proof requiring clear and convincing evidence of ultimate facts upon which termination of parental rights may be grounded.

■ It is established that a parent will not be deprived of his or her right to maintain the relationship which normally exists between parent and child without due process of law. *See State ex rel Juv. Dept. v. Wade,* 19 Or App 314, 527 P2d 753, 19 Or App 835, 528 P2d 1382 (1974), Sup Ct *review denied, appeal dismissed,* 423 US 806 (1975), *overruled on other grounds, F. v. C.,* 24 Or App 601, 547 P2d 175, Sup Ct *review denied* (1976), and United States Supreme Court cases cited therein; *see also State v. McMaster,* 259 Or 291, 486 P2d 567 (1971); *State v. Jamison,* 251 Or 114, 444 P2d 15, 444 P2d 1005 (1968); *F. v. C., supra.* Whether due process requires a standard more stringent than proof by a preponderance of the evidence in the termination context is a question of first impression in this jurisdiction.[2] To decide this question we must consider "* * * the precise nature of the government function involved as well as * * * the private interest that has been affected by governmental action. * * *" *Cafeteria Workers v. McElroy,* 367 US 886, 895, 81 S Ct 1743, 6 L Ed 2d 1230 (1961); *Wolff v. McDonnell,* 418 US 539, 560, 94 S Ct 2963, 41 L Ed 2d 935 (1974);

"(3) Unless there is an appeal from the order terminating the rights of the parent or parents, the order permanently terminates all rights of the parent or parents whose rights are terminated and the parent or parents have no standing to appear as such in any legal proceeding concerning the child."

[2] In *State ex rel Juv. Dept. v. Martin,* 19 Or App 28, 526 P2d 647, *reversed and remanded on other grounds,* 271 Or 603, 533 P2d 780 (1975), we declined to consider the constitutional issue on appeal because it had not been previously raised at the trial court level. Here, appellant raised the issue by way of a motion to dismiss based on the same constitutional grounds advanced herein.

*Morrissey v. Brewer,* 408 US 471, 481, 92 S Ct 2593, 33 L Ed 2d 484 (1972).

■■ The primary purpose of the provisions of the juvenile code, ORS ch 419, and the procedures established therein for the termination of parental rights, is the welfare of the child. *State v. McMaster, supra.* This court has held that the most important consideration in determining whether to terminate parental rights is whether termination is in the best interests of the child. *State v. Blum,* 1 Or App 409, 463 P2d 367 (1970). *See also State ex rel Juv. Dept. v. Wagner,* 21 Or App 396, 535 P2d 102, Sup Ct *review denied, cert denied,* 424 US 924 (1976). It cannot be gainsaid that the interest of the state in severing the rights of a parent when it is shown that the parent-child relationship is seriously detrimental to the child is of compelling importance. *See State v. McMaster, supra.*

In order to terminate parental rights, the state must prove either that

"* * * the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the forseeable [sic] future due to conduct or conditions not likely to change * * *"; that

"* * * the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for one year prior to the filing of a petition * * *"; or that

"* * * the parent or parents have abandoned the child or the child was left under circumstances such that the identity of the parent or parents of the child was unknown and could not be ascertained, despite diligent searching, and the parent or parents have not come forward to claim the child within six months following the finding of the child." ORS 419.523.[3]

---

[3] ORS 419.523 also delineates various factors for the court to consider in determining whether a statutory ground for termination exists. In its entirety, the statute provides as follows:

"(1) The parental rights of the parents of a child within the juris-

■ In view of the governmental function here involved and the stringency of the statutory grounds for termination, we believe that due process is served by requir-

diction of the juvenile court as provided in subsection (1) of ORS 419.476 may be terminated as provided in this section and ORS 419.525. The rights of one parent may be terminated without affecting the rights of the other parent.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the forseeable [sic] future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.

"(b) Conduct toward any child of an abusive, cruel or sexual nature.

"(c) Addictive use of intoxicating liquors or narcotic or dangerous drugs.

"(d) Physical neglect of the child.

"(e) Lack of effort of the parent to adjust his circumstances, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(3) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for one year prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

"(a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(b) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"(c) Failure to contact or communicate with the child or with the custodian of the child. In making this determination, the court may disregard incidental visitations, communications or contributions.

"(4) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents have abandoned the child or the child was left under circumstances such that the identity of the parent or parents of the child was unknown and could not be ascertained, despite diligent searching, and the parent or parents have not come forward to claim the child within six months following the finding of the child."

[ 228 ]

ing the state to show by a preponderance of the evidence that a ground for termination of parental rights exists. The evidence necessary to sever parental rights under the foregoing statutory provisions is indeed substantial. *Cf. Berry v. Letchworth,* 19 Or App 261, 527 P2d 145 (1974), and cases cited therein. We think that the mother is not denied due process of law when such evidence preponderates in favor of termination. *But see Alsager v. District Court of Polk Cty., Iowa,* 406 F Supp 10 (SD Iowa 1975).

■ The mother next assigns as error the insufficiency of the evidence to support the trial court's findings. We disagree. The evidence in support of the trial court's findings was substantial and we agree supported termination in this case. ORS 419.523(3).

The other assignments of error do not warrant discussion.

Affirmed.

**SCHWAB, C. J.,** specially concurring.

In *State v. Jamison,* 251 Or 114, 117, 444 P2d 15, 444 P2d 1005 (1968), the Oregon Supreme Court stated:

"The permanent termination of parental rights is one of the most drastic actions the state can take against its inhabitants. It would be unconscionable for the state forever to terminate the parental rights of the poor without allowing such parents to be assisted by counsel * * *."

Reasoning by analogy to criminal cases, the court stated: "* * * the consequences of the denial of counsel are as serious [in a termination-of-parental-rights case] as they are in most criminal prosecutions." 251 Or at 118.

I conclude that the *Jamison* analogy requires holding that if the drastic sanction of incarceration can only be imposed upon proof beyond a reasonable doubt, then likewise the drastic sanction of termination of

parental rights can only be imposed upon proof beyond a reasonable doubt.

I nevertheless concur in the majority's result because my *de novo* review satisfies me that the evidence in this case establishes, beyond a reasonable doubt, grounds for termination.