In the Matter of G. JOSEPH.

No. 2-680A182.

Court of Appeals of Indiana,
Fourth District.

Feb. 23, 1981.

Michelle A. Link, Nancy L. Cross, Legal Services Organization of Indiana, Inc., Muncie, for appellant.

Donald D. Chiappetta, Muncie, for appellee.

CHIPMAN, Judge.

This case involves the visitation of a father whose child has been declared a ward of the Delaware County Department of Public Welfare (Department). The trial court denied the petitioner's request to visit with his daughter. We affirm.

G. Joseph, daughter of Edward Joseph, was born in 1970. On May 23, 1972, G. was found to be a dependent and neglected child[1] and declared a ward of the Department. The record indicates wardship was dissolved in July of 1972 when the child was temporarily placed in the custody of her paternal grandparents. In 1975 a second petition for wardship was filed by the Department alleging G. was abused and therefore dependent and neglected. Once again G. was declared a ward of the Department.

Though the Department's wardship continued, the child was unexplainably returned to the custody of her father in 1976. In 1978, however, the child was again taken from the home because of parental neglect. Then, in December 1979, Edward filed a "Petition to Establish Visitation" alleging he had no knowledge of his daughter's whereabouts and had not visited with her since March of 1978. The trial court determined visitation by the father would not be in the best interests of the child and denied Edward's petition. He now appeals from that determination raising the following questions for our review:

1) whether in a proceeding to determine the visitation rights of a natural parent application of the "best interests of the child" standard violates the parent's fundamental constitutional right to have contact with his child,

2) whether there was sufficient evidence to support the trial court's decision, and

3) whether the trial court erred by not requiring the Department's case to be proven by clear and convincing evidence.

### I. Parental Rights and the "Best Interests of the Child" Rule

Petitioner first challenges the Indiana rule consistently applied in juvenile proceedings that "having once found ... [a] child to be a 'dependent [or neglected] child' the trial court ... [is] guided by the best interests of the child." *In re Collar*, (1973) 155 Ind.App. 668, 671, 294 N.E.2d 179, 182; *see also Duckworth v. Duckworth*, (1932) 203 Ind. 276, 179 N.E. 773; *In re Bender*, (1976) 170 Ind.App. 274, 352 N.E.2d 797; *In the Matter of Perkins*, (1976) 170 Ind.App. 171, 352 N.E.2d 502. Petitioner argues the trial court's application of the "best interests" standard in the present case unconstitutionally interferes with his fundamental rights to family integrity and parent-child communication. He contends the court should be required to grant reasonable visitation absent a showing that visitation would pose a substantial threat to the child's emotional or physical well-being. We hold the "best interests" standard is a constitutionally permissible standard when applied in determining the visitation rights of a father whose child has been found

---

1. IC 1971, 31-5-7-5 (Burns Code Ed.) (since repealed) provides:

"The words 'dependent child' as used herein, or in any other statute concerning the care, custody or control of children, shall mean any boy under the age of eighteen [18] years or any girl under the age of eighteen [18] years, who is a dependent upon the public for support, or who is destitute, homeless or abandoned."

IC 1971, 31-5-7-6 (Burns Code Ed.) (since repealed) provides:

"The words 'neglected child' as used herein, or in any other statute concerning the care, custody or control of children shall mean any boy under the age of eighteen [18] years or any girl under the age of eighteen [18] years who:

(1) Has not proper parental care or guardianship;

(2) Is destitute, homeless or abandoned;

(3) Habitually begs or receives alms;

(4) By reason of neglect, cruelty or disrepute on the part of parents, guardians or other persons in whose care the child may be is living in an improper place;

(5) Is in an environment dangerous to life, limb, or injurious to the health or morals of himself or others."

"However, such a child receiving care from an authorized agency need not necessarily come to the attention of the court."

dependent and neglected under Indiana law.

In the early case of *Meyer v. Nebraska*, (1932) 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, the U.S. Supreme Court held that the "liberty" guarantee of the Fourteenth Amendment "without doubt ... denotes ... the right of the individual ... to marry, establish a home and bring up children." *Id.* at 399, 43 S.Ct. at 626. The notion that the Due Process Clause recognizes and provides substantive protection for the family unit was subsequently reaffirmed in *Pierce v. Society of Sisters*, (1925) 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 and *Prince v. Massachusetts*, (1944) 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645, *rehearing denied*, 321 U.S. 804, 64 S.Ct. 784, 88 L.Ed. 1090. In *Prince* the court expressly recognized a constitutional barrier to governmental paternalism:

> "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder ... and it is in recognition of this that these decisions (*Meyer* and *Pierce*) have respected the private realm of family life which the state cannot enter."

321 U.S. at 166, 64 S.Ct. at 442. In *Stanley v. Illinois*, (1972) 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, the Supreme Court struck down an Illinois dependency statute that deprived an unmarried father the custody of his natural children upon the death of the mother. Justice White characterized the nature of Stanley's interest in the children he had lived with and supported:

> "The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'"

*Id.* at 651, 92 S.Ct. at 1212. The court concluded that the integrity of the family unit was protected by the Fourteenth Amendment due process and equal protection clauses. Similarly, our Indiana Supreme Court has recognized the parent-child relationship as "most hallowed" and "sacred." *Duckworth v. Duckworth*, 179 N.E. at 773.

We are therefore inclined to agree with appellant Joseph's initial premise that the Constitution recognizes a fundamental right to family integrity. Many federal and state courts have so held. *See, e. g. Davis v. Page*, 442 F.Supp. 258 (S.D.Fla. 1977); *Sims v. State Dept. of Public Welfare, etc.*, 438 F.Supp. 1179 (S.D.Tex.1977); *Kruse v. Campbell*, 431 F.Supp. 180 (E.D. Va.1977); *Roe v. Conn*, 417 F.Supp. 769 (M.D.Ala.1976); *Alsager v. Dist. Ct.*, 406 F.Supp. 10 (S.D.Iowa 1975), *affirmed*, 545 F.2d 1137 (8th Cir. 1976); *Interest of Brehm*, (1979) 3 Kan.App.2d 325, 594 P.2d 269; *In Interest of Howard*, (1980) La.App., 382 So.2d 194. We also acknowledge that state interference with a fundamental right may be justified only by the advancement of a compelling state interest. *Roe v. Wade*, (1973) 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147; *Shapiro v. Thompson*, (1969) 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; *Harper v. Board of Elections*, (1966) 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169.

A fundamental right to family integrity means that our federal constitution, as a matter of substantive due process, protects the private ordering of interpersonal relationships from state intrusion. It must surely be a relational right, encompassing the rights of both parent and child. There can be no question that the Due Process Clause would be offended " '[i]f a state were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' " *Quilloin v. Walcott*, (1978) 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (citing *Smith v. Organization of Foster Families*, (1977) 431 U.S. 816, 863, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14). *See Roe v. Conn*, 417 F.Supp. 769 (M.D.Ala.

1976). However, few would challenge the authority of the state, pursuant to its *parens patriae* power, to intervene when parental neglect, abuse or abandonment has been established. In such a case the state most certainly has a compelling interest in protecting the welfare of the child.

The question in the present case, however, takes us one step further: once a finding of neglect or abuse has been made, how may the state proceed with the most delicate task of protecting the child's welfare while at the same time preserving what remains of the family unit? Specifically, should the rights of the biological parent be considered paramount to what otherwise might be in the best interests of a child whose growth and development has already been threatened by neglect or abuse? We think the answer must be a resounding no.

The petitioner challenges the "best interests of the child" rule as "meaningless." He argues that absent a finding of danger to the child's mental or physical health, the rule could be applied to advance less than a compelling state interest, and therefore unconstitutionally interferes with the fundamental rights of the biological father. However, our review of the many decisions of this state which have applied the "best interests" standard shows our courts have in fact been primarily concerned, either explicitly or implicitly, with the emotional development and physical health of the child.

For example, the early case of *Luellen v. Younger*, (1924) 194 Ind. 411, 143 N.E. 163, involved a custody battle between the biological father of a young girl and the child's foster parents. Only a few months after the birth of his daughter the father voluntarily placed her in a foster home. Nine years later, surely after strong psychological bonds developed between the child and her foster parents, the father filed a habeas corpus action to regain possession of the girl. The court acknowledged the character of each party was good and that each had the financial ability to raise the child. On appeal, our Supreme Court affirmed the trial court's denial of the father's request for custody, stating:

> "[I]n determining disputes as to the custody of children the court acts as parens patriae, and regards the welfare of the child as the controlling consideration. [citations omitted] Thus, when the interests of the child will best be promoted by leaving it with its foster parent, the father will not be permitted to obtain its custody by judicial action."

143 N.E. at 164. In a similar case, *Beach v. Leroy*, (1950) 228 Ind. 122, 89 N.E.2d 912, the natural mother voluntarily placed her infant daughter in the custody of the child's paternal grandparents. Five years later the trial court denied the mother's petition for writ of habeas corpus finding it was in the child's best interests to remain in the custody of her grandparents. Again, our Supreme Court affirmed the lower court, restating the rule that:

> "The principles of the welfare of the child may be applied to defeat the claim of a parent when the parent has voluntarily relinquished to others the care and custody of the child *until the affection of the child and its foster parents have become so interwoven that to sever them would seriously mar and endanger the future welfare and happiness of the child."* (emphasis added)

89 N.E.2d at 914. Both the *Luellen* and *Beach* decisions recognized that continuity of relationships, surroundings, and environmental influence are essential for a child's normal development. In a fairly recent and often cited psychoanalytic work on child placement, the authors write:

> "Physical, emotional, intellectual, social and moral growth does not happen without causing the child inevitable internal difficulties. The instability of all mental processes during the period of development needs to be offset by stability and uninterrupted support from external sources. Smooth growth is arrested or disrupted when upheavals and changes in

the external world are added to the internal ones." [2]

In *Luellen* and *Beach* the court applied the "best interests" standard in an effort to safeguard the psychological development of the children involved. We believe the court in doing so forwarded a compelling state interest. *See also Unwed Father v. Unwed Mother*, (1978) Ind.App., 379 N.E.2d 467, and *In re Adoption of Dove*, (1977) Ind. App., 368 N.E.2d 6.

Not surprisingly, our courts have also utilized the "best interests" test in those instances where a child has been found dependent and/or neglected under our juvenile code. In *In the Matter of Perkins*, (1976) 170 Ind.App. 171, 352 N.E.2d 502, the children involved had been declared dependent and neglected. Their home was "maintained" in an unclean and disarrayed condition, with dilapidated furniture and holes in the wall. Their mother suffered from a psychiatric disorder. Their father refused to support them even though he had the ability. The trial court granted the welfare department's petition to have the children made wards of the state for purposes of adoption. On appeal the Third District found sufficient evidence to prove it was in the best interests of the children to terminate the rights of their parents and allow them to be permanently placed in adoptive homes.

Children were also found to be dependent and neglected in *In re the Wardship of Bender*, (1976) 170 Ind.App. 274, 352 N.E.2d 797. Their home was full of roaches, old rags, human waste, soiled clothing, and garbage. *Id.* at 801. Their mother had a serious drinking problem. The children were often absent from school and needed training in personal hygiene. *Id.* at 802. Despite the rehabilitative efforts of the Allen County Welfare Department, conditions in the home did not improve appreciably. The trial court found it was in the best interests of the children to terminate the rights of their parents. In its findings the

trial court noted the children had shown improvement in their "physical and mental development" while in foster homes, but regressed during placement and visitation with the biological mother. *Id.* at 803. The court also found:

" '[I]n the custody of the mother the children have practically no chance of becoming adjusted, self-sufficient members of society, but that in another home of stability and order they have a good chance of attaining adjustment and successful lives.' "

*Id.* In both *Perkins* and *Bender* the mental and physical health of the children were threatened by the environment created by their parents. In both cases the courts applied the "best interests of the child" standard in an effort to give the children the opportunity to experience stable psychological development. In both cases, we believe the courts forwarded a compelling state interest. *See also In re Collar*, (1973) 155 Ind.App. 668, 294 N.E.2d 179.

In short, the decisions of this state reveal the "best interests" standard has not been employed to make vague moral judgments about alternative lifestyles and parental fitness. Instead, the process of effecting that which is "in the best interests of the child" has in fact been an effort by our courts to preserve, and in some instances create, an environment conducive to the mental and physical development of the child—an environment which, to the extent possible, meets the "need of every child for unbroken continuity of affectionate and stimulating relationships with an adult." [3] As such, the "best interests" test without question forwards a compelling state interest which justifies the resultant interference with the rights of the biological parents.

We believe our holding not only to be in harmony with the Due Process Clause, but also consistent with Ind.Code 31–6–4–16, that section of our new juvenile code which guides the trial judge in determining an

2. J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child, at 32 (1973) (hereinafter cited as "Goldstein").

3. Goldstein, *supra* at 6.

appropriate disposition for a minor found to be a "child in need of services": [4]

> "(d) *When consistent with ... the welfare of the child*, the juvenile court shall enter a dispositional decree that:
> (1) least interferes with family autonomy;
> (2) is least disruptive of family life;
> (3) imposes the least restraint on the freedom of the child and his parent, guardian, or custodian; and
> (4) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian." (emphasis added) [5]

### II. Sufficiency of the Evidence

Turning to the facts of the present case, we find there was sufficient evidence to prove it was not in the best interests of the child to force her to visit with her biological father. First, the child has twice been declared a dependent and neglected child, the second time for reasons of abuse. Three times it has been necessary to remove her from her father's custody. While in her father's care the child often missed school or attended in dirty clothing. After being removed from her father's home in 1978 G. was eventually placed by the Department in a foster home, where she initially experienced problems adjusting to her new environment. However, by the time of the hearing on her father's petition to establish visitation, the child had finally become reasonably well-adjusted to foster care. Most significant is the fact that the child does not wish to visit with her father. In fact, she has nightmares that visitation might be forced upon her. The petitioner has apparently shown little interest in the child since last visiting her March 5, 1978. One caseworker testified:

> "We do not feel that it would be in her best interest. Mr. Joseph has contacted me since he last visited her on March the Fifth of Seventy Eight at the Children's Home. He has contacted me twice, once in May of Seventy Eight and said that he would request a visit when she was out of school in June. The last time he contacted me was in December the Twenty First of Seventy Eight, asking what G. wanted for Christmas. Said that he would bring a gift into the office after Christmas for me to give to G. He asked about visitation. I told him I was concerned about his lack of contact with the child and that we would talk about it when he came in with the gift for G. He never appeared in the office with a gift. I have not heard from him since requesting any visitation with the child.
>
> \* \* \* \* \* \*
>
> We feel that it would be more emotionally damaging for her to see her father

---

**4.** The terms "dependent" and "neglected" child have been abandoned by our new juvenile code. Ind.Code 31–6–4–3 now defines a "child in need of services":

> Sec. 3 (a) A child is a child in need of services if before his eighteenth birthday:
> (1) his physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of his parent, guardian or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision;
> (2) his physical or mental health is seriously endangered due to injury by the act or omission of his parent, guardian, or custodian;
> (3) he is the victim of a sex offense under IC 35–42–4–1, IC 35–42–4–2, IC 35–42–4–3(a), IC 35–42–4–3(b), IC 35–42–4–4, IC 35–45–4–1, IC 35–45–4–2, or IC 35–46–1–3;
> (4) his parent, guardian, or custodian allows him to participate in an obscene performance defined by IC 35–30–10.1–3 or IC 35–30–10.1;
> (5) his parent, guardian, or custodian allows him to commit a sex offense prohibited by IC 35–45–4; or
> (6) he substantially endangers his own health or the health of another."

**5.** The purpose and policy section of our new juvenile code provides in part:

> "It is the policy of this state and the purpose of this article:
> \* \* \* \* \* \*
> (2) to provide a judicial procedure that insures fair hearings and recognizes and enforces the constitutional and other legal rights of children and their parents;
> \* \* \* \* \* \*
> (5) to strengthen family life by assisting parents to fulfill their parental obligations; and
> (6) *to remove children from their families only when it is in the child's best interest* or in the best interest of public safety." (emphasis added)

after this long period of time and because of the things she has said."

The caseworkers were particularly concerned that the child's adjustment to her present foster home would be jeopardized by visits from the father.

We find the trial court did not abuse its discretion by denying petitioner the right to visit his daughter. The child has already been threatened by parental neglect. The trial judge was in reality faced with the task of choosing the least detrimental alternative for safeguarding the child's growth and development. The court obviously found that in light of the child's attitude and the history of parental neglect in this case, it was better to preserve the child's recent adjustment to her foster home despite the problems associated with the temporary nature of that placement.[6]

### III. Standard of Proof

Petitioner argues the Department should have been required to prove its case by "clear and convincing evidence." Joseph argues the "preponderance of the evidence" test does not adequately protect his fundamental constitutional rights as a natural parent. We hold the higher evidentiary standard was not required in this proceeding.

In support of his argument petitioner cites *Addington v. Texas*, (1979) 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323, a case in which the Supreme Court discussed and delineated the standard of proof required by the Due Process Clause in a civil commitment proceeding. Prefacing his discussion of the issue by suggesting that standard-of-proof catch-words may not always make a great deal of difference in a particular case, an observation which we share, Chief Justice Burger went on to hold a "clear and convincing" standard is required by the Fourteenth Amendment in a civil proceeding to commit an individual involuntarily for an indefinite period of time to a state

mental hospital. *Id.* at 433, 99 S.Ct. at 1813.

■ We acknowledge that a standard of proof serves to "instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, (1970) 397 U.S. 358, 370, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (Harlan, J., concurring). The standard, be it "beyond reasonable doubt", "clear and convincing evidence", or a "preponderance of the evidence", serves to allocate the risk of error between litigants and to indicate the importance attached to the ultimate decision. *Addington*.

The "beyond reasonable doubt" standard has thus far been constitutionally required only in criminal prosecutions and juvenile delinquency proceedings. As the court stated in *Addington*, "[t]he heavy standard applied in criminal cases manifests our concern that the risk of error to the individual must be minimized even at the risk that some who are guilty might go free." *Id.* at 428, 99 S.Ct. at 1810. At the other end of the spectrum is the "preponderance" test, which roughly distributes the risk of error equally between civil litigants. Somewhere in the middle lies the "clear and convincing" standard, which the court found to be necessary in *Addington*:

"The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state. We conclude that the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id.* at 427, 99 S.Ct. at 1810.

■ Petitioner's argument, however, ignores the crucial difference between the

6. In a related argument petitioner contends the case must be reversed because there was insufficient evidence produced at trial to support the trial court's decision, and therefore the court must have relied primarily on the private interview with the child, citing *Blue v. Brooks*, (1973) 261 Ind. 338, 303 N.E.2d 269. However, we find sufficient evidence in the record to support the denial of visitation. We also find no merit to petitioner's argument that the trial court was required to enter special findings of fact in the present case.

nature of the proceeding in *Addington* and the present case. The risk of an erroneous decision here cannot simply be allocated between the biological father and the state. The interests of a child are also involved. As the Supreme Court of Delaware stated in *In the Matter of Five Minor Children*, (1979) Del., 407 A.2d 198:

> "[T]he *Addington* case differs from this case in that the court there was weighing the interests of the individual against those of the state, whereas in parent right termination proceedings, the interests of the child are at least on a par with the interests of the parents."

*Id.* at 200. *See also In the Matter of S.*, (1976) 26 Or.App. 219, 552 P.2d 578; *In the Matter of R. E. W.*, (1976) Tex.Supr., 545 S.W.2d 573 (1976). We hold the "clear and convincing evidence" standard was not constitutionally required in the present case.

The decision of the trial court is affirmed.

MILLER, J., concurs.

YOUNG, P. J., dissents with opinion.

YOUNG, Presiding Judge, dissenting.

I dissent and would reverse the trial court.

It is not sufficient to find that the visitation requested by the natural father would not be in the "best interest" of the child. The trial court must specifically find that such visitation might endanger the child's physical health or significantly impair his emotional development. I conclude that the evidence in the record is insufficient to meet that standard.[1] While the evidence may be sufficient to support removal of the child from the home, it is insufficient to satisfy the stricter standard required where a termination of visitation rights is attempted.

1. The trial judge conducted an *in camera* interview with the child but did not make a record of the conversation. Because no record was made, the *in camera* interview adds nothing to the sufficiency of the evidence available upon review.