Frank **RZESZUTEK**, Donna Rzeszutek, Lisa Rzeszutek, Margaret Buchanan, Maria Rzeszutek and Tony Rzeszutek, Appellants–Respondents,

v.

Garey **BECK**, Appellee–Petitioner.

No. 71A04–9410–CV–406.

Court of Appeals of Indiana, Fourth District.

April 26, 1995.

Transfer Denied Sept. 28, 1995.

---

John C. Hamilton, Doran, Blackmond, Ready, Hamilton & Williams, South Bend, for appellants.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Frank Rzeszutek, Maria Rzeszutek, Lisa Rzeszutek, Donna Rzeszutek, Tony Rzeszutek and Margaret Buchanan appeal the trial court's one-year extension of a protective order in favor of Garey Beck. We affirm.

### ISSUES

I. Does the phrase "a member of the petitioner's household" found in Ind.Code 34–4–5.1–2 include an adult, or is it limited to minors and other dependent persons?

II. As applied, does I.C. 34–4–5.1 violate the Rzeszuteks' right to privacy and family integrity?

III. As applied, does I.C. 34–4–5.1 violate the Rzeszuteks' free speech and association rights?

IV.  Did the trial court err in basing its decision on hearsay evidence?

V.  Did the trial court apply the correct burden of proof?

### FACTS

Frank and Maria Rzeszutek immigrated from Poland in 1969.  They settled in South Bend, where they raised a family and operated a bakery.  The Rzeszuteks' youngest daughter, Lucy, graduated from Washington High School and enrolled in the University of Notre Dame in approximately 1992.[1]  During Lucy's freshman year, she moved out of her on-campus dormitory and into the home of Garey Beck and his family.[2]  Shortly thereafter, Lucy dropped out of Notre Dame.

On May 6, 1993, Beck filed a petition in small claims court for a protective order on behalf of himself, his wife, his daughters, and Lucy Rzeszutek.  The respondents were Frank and Maria Rzeszutek, Lucy's mother and father, and Tony, Donna, and Lisa Rzeszutek, and Margaret Buchanan, Lucy's brother and sisters.  Beck's petition asserted in pertinent part as follows:

> The Petitioner ... states that the Respondent has abused or threatened to abuse the petitioner's person and/or property as follows ...: harassing phone calls, threatening to kidnap daughters, coming to places of employment and harassing, accusations of being a cult, threatening to bring an "army" to workplace and home to get Lucy and the rest of us, coming by our house when not at home and looking in windows—this was seen by neighbors, calling all hours of day with many hangups.

R. at 21.  Following a May 24, 1993, hearing, the court issued a permanent and reciprocal protective order.

On May 18, 1994, Beck filed a motion in small claims court to extend the 1993 protective order for an additional year.  The trial court held a hearing June 8, 1994.  Beck introduced a list of incidents, compiled by Lucy Rzeszutek and the Beck family, and signed by Lucy Rzeszutek, which had occurred since the issuance of the 1993 protective order.  The list provides in pertinent part as follows:

> *May 24, 1993*—Margaret driving back and forth, watching house.  Also parked at Ross' Market and watched house.  She called police from payphone to try to have them come to our house....
>
> *August 11, 1993*—Lisa taking pictures at our house.  Police report made in this time frame....
>
> *August 17, 1993*—Lisa at the Overholser's telling their son that I had been raped, abused, and held prisoner by the Becks.  She had went to all our neighbors spreading the same story.  These actions resulted in our filing of a petition of restraining order violation.  The hearing resulted in a 5 day sentence given to Lisa.  After being released later that afternoon she was back out to the Parker's house across the street with Margaret and Donna....
>
> *October 11, 1993*—Received information of a petition being circulated against me, the church I attend, and Derby, Inc.[3]....
>
> *November 21, 1993*—Saw Maria and Frank at Value City store.  She spit on Mr. Beck.  He turned and left to avoid a confrontation....
>
> *February 21, 1994*—House shot at.  Police dug bullet out and a report filed.
>
> *February 22, 1994*—Flowers brought to Derby by someone posing as an "aunt and friend."  I did not know them.
>
> *March 14, 1994*—Maria spit at Mrs. Beck at L.S. Ayres.
>
> .     .     .     .     .
>
> *March 28, 1994*—Margaret and her husband at our house.  Also in this time frame I was informed by friends at work that they were offered money to come to my house and spy.
>
> *March 30, 1994*—We went out of town and had a friend take care of my cat and Gwen's bird.  She was followed to her

---

**1.**  Lucy did not have to pay tuition at Notre Dame because her father was a university employee.

**2.**  According to Beck's verified petition for a protective order, Beck and his wife are both 43 years old.  They have two teenaged daughters, ages 19 and 16.

**3.**  It appears from the record that Lucy Rzeszutek is employed at Derby, Inc.

friend's house by a yellow van fitting the description of Lisa's. The driver tried to get her to pull over....

These are only the incidents that we took time to document. There have been numerous phone hangups, drive bys, letter written to Mr. Beck's place of employment, Mrs. Beck's previous place of employment, etc.

R. at 7–8.

The Rzeszuteks presented evidence from five witnesses. Josie Lentych, a childhood friend of Lucy's, testified that Lucy had become quiet and shy while living with the Becks. Lentych further testified that when she visited Lucy at Notre Dame, Lucy had quoted to her from a highlighted Bible. Zoltan Rolko, a florist, testified that he delivered flowers to Lucy at Derby, Inc. in January 1994. When he returned two weeks later with another delivery, a gentleman who appeared to be a Derby, Inc.'s employee told Rolko that he could not deliver the flowers to Lucy. Katherine Couch, a Rzeszutek family friend, testified that the Rzeszuteks were devoted to their children, and that she knew of no reason Lucy would be hostile to her family. Reverend Eugene Kazmierczak testified that the Rzeszutek children had recited poetry and sung songs, and that he was glad to see that Lucy had "cross[ed] the tracks and [made] Notre Dame." R. at 69. Lastly, Phil Parker, a neighbor of the Becks, testified that the Rzeszuteks had visited him in the past, and that they did not seem erratic or crazy.

After hearing evidence, the trial court extended the protective order for an additional year. The trial court's memorandum accompanying the protective order states in pertinent part as follows:

The court having conducted a hearing on petitioner's motion to extend the protective order for a period of more than one year pursuant to the provisions of I.C. 34–4–5.1–5 has determined that the protective order should be extended for a period of one year from May 24, 1994 as to the respondents Frank Rzeszutek, Maria Rzeszutek, Tony Rzeszutek, Maria [sic] Buchanan and Lisa Rzeszutek (the latter by reason of her refusal of the service of notice).

Briefly my reasons. The petitioner testified to a sufficient number of incidents during the year that the original protective order was in effect which was supported by Lucy Rzeszutek's listing of incidents (Petitioner's Exhibit # 1) which justifies the Court in renewing the order for an additional year....

This is a very unfortunate situation. The Respondents are a tight-knit, hard working and respectable family. They cannot accept the fact that one of their own is seeking a life away from them. However, Lucy is 20 years of age, has every right to do as she pleases and it appears to this observer that they just won't "let go".

Their approach seems to be "she must be crazy or under some evil influence or she never would leave us"—but unfortunately for them she is 20 years old and has every right to do as she desires. I respectfully suggest that reconciliation is more apt to occur if the Respondents let her go her own way....

R. at 9–10.

The Rzeszuteks now appeal the trial court's extension of the protective order.

### DECISION

We first note that Beck did not file an appellate brief for our examination and review. When an appellee fails to submit a brief, an appellant may prevail by making a prima facie case of error. *Farm Credit Services v. Estate of Decker* (1993), Ind.App., 624 N.E.2d 491, 493. The prima facie error rule protects this court and relieves it from the burden of controverting arguments advanced for reversal, a duty which properly remains with counsel for the appellee. *Id.*

### I. *Statutory Interpretation*

Ind.Code 34–4–5.1–2 states in pertinent part as follows:

(a) A person[4] may petition any court of record for a protective order on behalf of that person or *a member of the petitioner's household.*

(b) The petition:

(1) Must include the name of the petitioner and the name and address (if known) of the respondent;

(2) Must include any allegation concerning the date or manner of specific acts or feared acts of abuse, harassment, or disruption of the peace of the petitioner or *members of the petitioner's household* or any allegations concerning specific damage to or the fear of damage to any property of the petitioner;

(3) Must include a request that if the court grants the protective order the court shall order the respondent:

(A) To refrain from abusing, harassing or disturbing the peace of the petitioner by either direct or indirect contact;

(B) To refrain from abusing, harassing, or disturbing the peace of a member of the petitioner's household either by direct or indirect contact;

(C) To refrain from entering the property of the petitioner, jointly owned or leased property of the petitioner and respondent if the respondent is not the sole owner or lessee, or any other property as specifically described in the petition;

(D) To refrain from damaging any property of the petitioner;

(4) Must be sworn to by the petitioner;

(5) Must include a request that the court set a date for a protective order hearing under this chapter.

(6) Must be accompanied by a confidential form concerning protective orders prescribed or approved by the division of state court administration; and

(7) May include a request that the court order counseling or other social services, including domestic violence education,

for the petitioner, the respondent or both. (emphases added).

■ Rzeszutek points out that I.C. 34-4-5.1-1 does not define the phrase "a member of the petitioner's household." He then argues that the definition of this phrase does not include an adult. Rather, Rzeszutek contends that:

[T]he statutory scheme look[s] to "petitioner" and "respondent" as adults and "member[s] of the petitioner's household," as dependant, including a minor or other person unable to care for him or herself.

Rzeszutek's Brief, p. 11. According to Rzeszutek, because I.C. 34-4-5.1-1 defines the term person as "includ[ing] human beings aged eighteen [18] or older, and [emancipated] minors", the legislature 'surely could not have ... intended ... to say that a 'person' as defined in I.C. 34-4-5.1-1, means the same thing as 'member of ... [a household].'" Rzeszutek's Brief, p. 12. Without authority for his proposition, Rzeszutek further contends that the "Legislature did not intend to allow a 'person' to petition for a protective order on behalf of another person, that is, an adult or emancipated minor, merely because that 'person' happened to live in the petitioner's household." Rzeszutek's Brief, p. 12. Applying his arguments to the facts of this case, Rzeszutek argues that because Lucy is 20 years old, and not incapable of taking care of herself, she is not "a member of the petitioner's household" as contemplated by the statute, and Beck did not have the authority to petition for a protective order on her behalf. We disagree.

"[W]hen a statute is clear and unambiguous on its face, this court need not, and indeed may not, interpret the statute. Instead, we must hold the statute to its clear and plain meaning." *Miller v. Walker* (1994), Ind.App., 642 N.E.2d 1000, 1001-2 (citations omitted). The language of I.C. 34-4-5.1-2 is clear—a person may petition for a protective order on behalf of one's self, or a member of one's household. Although Ind.Code 34-4-5.1-1 does not define household or member of household, prior case law is instructive.

---

**4.** I.C. 34-4-5.1-1 defines "person" as follows: "Person" includes human beings aged eighteen [18] or older, and [emancipated] minors.

In *Allstate Insurance Co. v. Neumann* (1982), Ind.App., 435 N.E.2d 591, this court stated as follows:

> A household may be defined as consisting of those who dwell under the same roof and compose a family; a domestic establishment. *Webster's New International Dictionary, Unabridged,* 2nd, Ed. The term has been said to be synonymous with "family" but broader, in that it includes servants or attendants; all who are under one domestic head. *Engebretson v. Austvold* (1937), 199 Minn. 399, 271 N.W. 809, 810. It is not restricted to relatives by blood or marriage.

*Id.* at 593–94.

Here, it is undisputed that Lucy Rzeszutek "dwells under the same roof" as Mr. and Mrs. Beck and their children. She has been living with the Beck family for more than a year. Clearly, Lucy is a member of the Becks' household. Accordingly, Beck had the authority to petition for a protective order on Lucy's behalf.

▇ Nevertheless, in an attempt to support his proposition that Beck did not have the authority to petition for a protective order on Lucy's behalf, Rzeszutek next argues that a "flat ban on all communication between the Rzeszuteks and Lucy is not consistent with the policy I.C. 34–4–5.1 so obviously reflects and embodies." Rzeszutek's Brief, p. 14. Without authority for this proposition, Rzeszutek posits that the "purpose of I.C. 34–4–5.1 is not to bar all communication between related individuals, but rather to limit communication between or among them and provide means of counseling and social services, thus facilitating the return to a level of normal interaction and communication." Rzeszutek's Brief, p. 14. We disagree with Rzeszutek's characterization of the purpose of I.C. 34–4–5.1.

There is nothing in the language of I.C. 34–4–5.1 to support Rzeszutek's proposition that the purpose of the statute is to limit communication, provide means of counseling and social services, thus facilitating the return to normal interaction and communica-

tion. The only section in I.C. 34–4–5.1–2(b)(7), *supra,* which mentions counseling, provides as follows:

> (b) The petition:
>
> (7) *May* include a request that the court order counseling or other social services . . . for the petitioner, the respondent, or both.

In contrast, I.C. 34–4–5.1–2(b)(3), *supra,* provides in pertinent part as follows:

> (b) The petition:
>
> (3) *Must* include a request that if the court grants the protective order the court *shall* order the respondent:
>
> (A) To refrain from abusing, harassing, or disturbing the peace of the petitioner, by either direct or indirect contact.
>
> (B) To refrain from abusing, harassing, or disturbing the peace of a member of the petitioner's household, by either direct or indirect contact.
>
> (C) To refrain from entering the property of the petitioner. . . .
>
> (D) To refrain from damaging any property of the petitioner.

▇ According to I.C. 34–4–5.1–2(b)(3), it is mandatory that a protective order petition include a request that the court order the respondent to refrain from abuse, harassment and disturbance of the peace if the court grants the protective order. However, a request for counseling is discretionary. In addition, even if the petitioner requests counseling, the decision whether to order it is within the trial court's discretion.

In addition, our research has revealed three cases citing I.C. 34–4–5.1,[5] none of which support Rzeszutek's proposition. Although *Marshall* and *Spangler* are inapposite to the facts before us, *Tillman* is instructive. In *Tillman,* Leslie Tillman's stepfather adopted her when she was a small child. Seven and one half years later, Sandy Snow, Leslie's mother, received a letter from Tillman, Leslie's biological father, requesting visitation with Leslie. The Snows petitioned for a permanent protective order against Till-

---

5. *State v. Marshall Superior Court II* (1994), Ind., 644 N.E.2d 87; *Spangler v. State* (1993), Ind., 607 N.E.2d 720; *Tillman v. Snow* (1991), Ind. App., 571 N.E.2d 578.

man and his sisters. The trial court granted the petition, and we affirmed. Our decision mentions nothing about providing counseling and facilitating a return to a level of normal interaction and communication.

In conclusion, Lucy Rzeszutek is a member of Beck's household. According to the statute, Beck is authorized to obtain a protective order on her behalf. In addition, Rzeszutek has failed to demonstrate that our interpretation of the statute conflicts with its purpose.

## II. *Right of Privacy*

■ Rzeszutek argues that, as applied, I.C. 34–4–5.1 violates the Rzeszuteks' right to privacy and family integrity. Specifically, Rzeszutek argues as follows:

> For the State, under these circumstances, to empower an adult, unrelated to another adult, to terminate all communication between the "protectee" and her family violates, at the least, the family members' right to privacy, and integrity of their family.

Rzeszutek's Brief, p. 15–16. In support of his argument, Rzeszutek directs us to *In the Matter of G. Joseph* (1981), Ind.App., 416 N.E.2d 857, wherein this court acknowledged that the "Constitution recognizes a fundamental right to family integrity." *Id.* at 859. G. Joseph was born in 1970. In 1972, she was found to be a dependent and neglected child, and declared a ward of the Department of Public Welfare. She was later placed in the custody of her paternal grandparents. In 1975, the welfare department filed a second petition alleging that G. was dependent and neglected. She was once again declared a ward of the welfare department. G. was inexplicably returned to her father's custody in 1976. However, she was taken from the home in 1978 due to parental neglect. In 1979, her father filed a Petition to Establish Visitation. The trial court denied his petition, and G.'s father appealed. The issue before us was:

> Whether in a proceeding to determine the visitation rights of a natural parent application of the "best interests of the child" standard violated the parent's fundamental

constitutional right to have contact with his child.

*Id.* at 858.

This court agreed with the father's initial premise that the "Constitution recognizes a fundamental right to family integrity." *Id.* at 859. We stated as follows:

> There can be no question that the Due Process Clause would be offended " '[i]f a state were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest. *Quilloin v. Walcott,* (1978) 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (citing *Smith v. Organization of Foster Families,* (1977) 431 U.S. 816, 863, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14).

*Id.* However, we affirmed the trial court after determining that the best interests standard did not violate the father's constitutional right to have contact with his child. We also found that there was sufficient evidence that it was not in G.'s best interests to force her to visit with her father. We noted that, "[m]ost significant is the fact that the child does not wish to visit with her father." *Id.* at 862.

Our review of *Joseph* leads us to the conclusion that the case fails to support Rzeszutek's proposition that, as applied, I.C. 34–4–5.1 violates the Rzeszuteks' right to privacy and family integrity. In addition, *Joseph* is distinguishable from the facts before us. G. Joseph was eight years old at the time of the hearing. The case concerned a father's petition to establish visitation. We determined that the trial court had not erred in denying the petition, and considered it significant that the eight year old girl did not wish to visit with her father. Here, Lucy Rzeszutek is 20 years old, and this case does not concern a parent's petition to establish visitation. Rather, it concerns the issuance of a protective order pursuant to I.C. 34–4–5.1. Having determined that Lucy is a member of Beck's household as contemplated by the statute, and that Beck has the authority to obtain a protective order on her behalf, we now find that the application of the statute does not

violate the Rzeszuteks' right of privacy and family integrity.

### III. *Free Speech and Association Rights*

■ Rzeszutek argues that, as applied, I.C. 34–4–5.1 violates the Rzeszuteks' free speech and association rights. Specifically, Rzeszutek argues as follows:

> In addition to the trial court's order mandating that the Rzeszuteks refrain from conduct such as abusing or threatening Beck or a member of his household, the court ordered all of them to refrain from attempting to contact, directly or indirectly, Beck or a member of his household, including Lucy. By doing so, the court closed off all avenues of communication between the Rzeszuteks and their daughter and sister. Because it provided no alternative avenues of communication, the order completely destroyed the Rzeszutek's ability to associate with and speak to Lucy. Surely, less drastic measures could have been taken. Surely, the standards applicable to government interference with the right to free speech demand that less drastic means be employed and that alternative avenues of communication be left open and available to Lucy's family.

Rzeszutek's Brief, p. 19.

Rzeszutek's reliance on the first amendment is misplaced. *See Swank v. Smart* (1990), 7th Cir., 898 F.2d 1247. In *Swank,* police officer Gary Swank took 17 year old Tina Millin, a stranger, for a ride on his motorcycle between 12:30 and 1:30 a.m. Another police officer saw Swank and Millin, and reported it to the chief of police. Swank was fired for conduct unbecoming an officer, and he brought a civil rights suit against the town that fired him and against the officials actually responsible for the firing. Swank contended that his dismissal from the police force deprived him of his constitutional rights to freedom of speech and freedom of association. Judge Posner, speaking for the Seventh Circuit Court of Appeals, responded as follows:

> The free-speech claim is quickly dispatched. The conversation between Swank and Tina on the motorcycle was speech in the literal sense, but not speech protected by the free-speech clause of the First Amendment (made applicable to the states and their subdivisions via the Fourteenth Amendment by *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925)). It was also association in the literal sense, but not association "for the advancement of beliefs and ideas." *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). The purpose of the free-speech clause and of its judge-made corollary the right of association is to protect the market in ideas, *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting), broadly understood as the public expression of ideas, narrative, concepts, imagery, opinions— scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify or entertain. Casual chit-chat between two persons or otherwise confined to a small social group is unrelated, or largely so, to that marketplace, and is not protected. Such conversation is important to its participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the speech that is protected by the First Amendment.

*Id.* at 1250–51.

In an Oklahoma case, the defendant was convicted of violating a protective order issued pursuant to the Protection From Domestic Abuse Act. On appeal, he argued that the Act was unconstitutional because it violated his "freedom of speech with his . . . spouse." *Gilbert v. State* (1988), Okla.Crim. App., 765 P.2d 1208, 1209. The Oklahoma Court of Criminal Appeals "reject[ed] any notion that the First Amendment to the United States Constitution or Article 2, s 22 of the Oklahoma Constitution ever covered threatening or abusive communication to persons who have demonstrated a need for protection from an immediate and present danger of domestic abuse." *Id.*

■ Here, the person to person conversations between Lucy and her family members are largely unrelated to the market in ideas,

and they are not protected by the first amendment. In addition, Beck presented evidence that the Rzeszuteks had engaged in threatening and abusive communication directed at himself, his immediate family, and Lucy Rzeszutek. As noted in *Gilbert, supra,* such threatening and abusive communication is not protected either. As applied, I.C. 34–4–5.1 does not violate the Rzeszuteks' free speech and association rights.

### IV. *Hearsay Evidence*

■ Rzeszutek contends that the "evidence on which the order was based was essentially, if not exclusively, hearsay."[6] Rzeszutek's Brief, p. 10. Although he acknowledges that "small claims courts can consider hearsay evidence," Rzeszutek contends that the "rule taken from administrative contexts that decisions may not be based solely on hearsay evidence should be applied here given the important values this case involves." Rzeszutek's Brief, p. 10.

The rule to which Rzeszutek refers is the modified residuum rule. In *C.T.S. Corp. v. Schoulton* (1979), 270 Ind. 34, 383 N.E.2d 293, our supreme court discussed this rule as follows:

> Indiana courts have unerringly applied a modified version of the Residuum Rule.... The Board can admit all hearsay evidence without fear of automatic reversal. If properly objected to at the hearing and preserved on review and not falling within a recognized exception to the Hearsay Rule, then an award may not be based solely upon such hearsay.

*Id.* 383 N.E.2d at 296.

We have previously rejected an "invitation to subject small claims procedures to the 'modified' residuum requirements." *Matusky v. Sheffield Square Apartments* (1994), Ind.App., 639 N.E.2d 336, 337. In *Matusky,* we noted that the "Small Claims Rules were adopted in order to provide ordinary citizens with a means of obtaining swift and uncomplicated resolution of minor disputes." *Id.* We cited Ind.Small Claims Rule 8(A) which provides as follows:

The trial shall be informal, with the sole objective of dispensing speedy justice between the parties according to the rules of substantive law, and shall not be bound by the statutory provisions or rules of practice, procedure, pleadings or evidence except provisions relating to privileged communications and offers of compromise.

We further found that:

> The attempt to engraft onto the clear provision of S.C. 8(A) the so-called "modified residuum" rule from the administrative law area is an unwarranted attempt to rewrite the Small Claims Rules, the effect of which would be to impose technical rules upon largely untrained litigants completely thwarting the express purpose of providing an uncomplicated and simple method of resolution of issues in order to dispense speedy justice between the parties.

*Id.* We once again decline an invitation to subject small claims procedures to the modified residuum rule. The trial court did not err in basing its decision on hearsay evidence.

### V. *Burden of Proof*

■ Rzeszutek argues that the "court obviously weighed [the] evidence by the preponderance burden of proof rather than the burden of clear and convincing evidence that applies in termination of relations between parent and minor child." Rzeszutek's Brief, p. 10. We agree with Rzeszutek that the court applied the preponderance of the evidence burden of proof; however, this was not error.

Despite Rzeszutek's characterization of the case, it is not a termination of parental rights case. Rather, it is a protective order case which is governed by I.C. 34–4–5.1. According to I.C. 34–4–5.1–5(a), the burden of proof is by a preponderance of the evidence. *See Tillman v. Snow* (1991), Ind.App., 571 N.E.2d 578. Accordingly, the trial court applied the correct burden of proof.

Affirmed.

6. The protective order was based on Beck's testimony and the list of incidents which Beck, his family and Lucy Rzeszutek compiled.

KIRSCH, J., concurs.

RILEY, J., dissents with separate opinion.

RILEY, Judge, dissenting.

I respectfully dissent. The term family means a collective body of persons who form one household, under one head, and is subject to one domestic government, and who have reciprocal, natural, and moral duties to support and care for each other. *Cole v. Cole* (1988), Ind.App., 517 N.E.2d 1248, 1250, citing *Crump v. Coleman* (1979), 181 Ind.App. 414, 391 N.E.2d 867. It is clear to me that Lucy has reciprocal, natural and moral duties owing to the Rzeszuteks and not Mr. Beck. I believe that IND.CODE 34-4-5.1 as applied does violate the Rzeszutek's right to privacy and family integrity. This court has held that the "Constitution recognizes a fundamental right to family integrity." *In The Matter of G. Joseph* (1981), Ind.App., 416 N.E.2d 857, 859.

A "person," (a human being aged 18 years or older or an emancipated minor) may petition the court to protect a "member of the petitioner's household." A person is only one human being and that person is asserting a right to be protected. In asserting this right to be protected he or she is also stating that because he or she is the head of this "domestic government" that he or she has a duty to protect others within his or her care. Lucy does not fall within this broad penumbra of protection. She is not a member of this household through blood or marriage and no one in the Beck household has a duty to support or care for her.

The only common sense way to approach the interpretation of "member of household" in this statute is to exclude those non-family adult members who may be living under one roof for whatever reason. If they wish to assert the right to be protected they must petition the court for their own safety.

I.C. 34-4-5.1-2(b)(7) allows for the court to order counseling or other social services for the petitioner, respondent, or both. By adding this provision, the legislature has allowed the court to intervene and try to provide services to those people in need of direction. If we allow Lucy to hide behind the coattails of Mr. Beck we will never know if she is voluntarily participating in this request for protection nor will the court ever be able to order counseling or other intervention in a potentially explosive situation. If each adult non-family member of a household is allowed to be "protected" by a human being 18 or older or emancipated minor living in the same household, the intent of the legislature has been circumvented because that "member of a household" will never have to appear in court and be questioned as to his or her intent or needs.